**COLONIAL AT LYNNFIELD, INC.,**
Plaintiff, Appellee,

v.

**Stephen SLOAN, et al.,**
Defendants, Appellees.

**Appeal of Richard D. ZIPES, et al.,**
Defendants, Appellants.

**COLONIAL AT LYNNFIELD, INC.,**
Plaintiff, Appellee,

v.

**Stephen SLOAN, et al.,**
Defendants, Appellants.

Nos. 88–1825, 88–1826.

United States Court of Appeals,
First Circuit.

Heard Jan. 10, 1989.

Decided March 21, 1989.

Ripley E. Hastings with whom Harvey Weiner, Alexander H. Pratt, Jr., Peabody & Arnold, George E. Richardson and Johnson, Clapp, Stone & Jones, Boston, Mass., were on brief, for defendants, appellants.

Marilyn D. Stempler with whom Brown, Rudnick, Freed & Gesmer, Boston, Mass., was on brief, for plaintiff, appellee.

Before COFFIN, BOWNES and SELYA, Circuit Judges.

COFFIN, Circuit Judge.

This case arises out of a failed contract for the purchase of a 49% interest in the Colonial Hilton Inn in the towns of Lynnfield and Wakefield, Massachusetts. The seller, Colonial at Lynnfield, Inc. (Colonial), sued the prospective buyer, Colonial Associates (Associates),[1] for breach of contract and liquidated damages in the amount of $200,000. The district court found that the buyer was at fault, and held that Colonial was entitled to the liquidated damages. Associates claims that the contract containing the liquidated damages provision had expired by the time the deal collapsed, and that the provision was otherwise unen-forceable. Defendants also assert that the district court erred in dismissing its counterclaims against plaintiff. We affirm judgment for Colonial on the counterclaims, but reverse the award of liquidated damages on the ground that, under Massachusetts law, it constitutes a penalty.

I.

Plaintiff Colonial and defendant Associates came together in mid–1980 when Colonial was attempting to solve its worsening financial crisis by selling a partial interest in the hotel. Colonial's fiscal problems stemmed from a major expansion and renovation of the hotel. As construction progressed, blocks of rooms needed to be shut down for refurbishing, resulting in a loss of income. The losses were exacerbated by increasing costs for overhead, borrowing, and inflation. Colonial's cash flow suffered, and it needed more money to cover its increased costs.

On November 12, 1980, Colonial and Associates signed an Agreement of Sale (the Agreement) in which Associates contracted to pay $3,375,000 for 49% of the hotel. The Agreement gave Associates time to test the market so that it could determine whether it could raise the funds for the purchase price by selling units in a limited partnership. If after that time Colonial Associates decided against going ahead with the purchase, it had no obligation to Colonial. If it wished to go forward, it was required to give a Notice to Proceed, and to be prepared for a closing shortly thereafter. Once Associates gave the Notice to Proceed, it was subject to a $200,000 liquidated damages provision. That provision would be activated, however, only if the transaction failed to close solely due to Associates' fault.

The district court found that Associates was required to give notice of their intention to proceed with the transaction on or before April 2, 1981, and that they failed to do so. The deal did not at that point fall apart, however. Associates asked for a

---

meeting to discuss the situation, and Colonial agreed so long as the defendants set a closing date. In a letter dated April 16, 1981, Associates agreed to close on June 1.

At a meeting in Boston on April 21, the parties discussed various modifications to their original agreement. Three days later, Colonial's counsel sent a letter to Associates' counsel stating that the parties had agreed that Colonial would receive an additional $100,000 from Associates "in consideration of the delay in this matter and for other valuable consideration." The letter stated that Associates' counsel should "prepare the necessary memorandum of agreement carrying the foregoing into effect." The letter concluded by noting that time is of the essence with respect to the June 1 closing date. It appears that no memorandum of agreement ever was prepared.

On May 22, Colonial obtained a $318,000 loan from EssexBank by assigning as collateral its "right, title and interest" in the Agreement with Associates. The assignment was to become null and void when the loan was repaid, presumably after the closing with defendants. On May 29, Associates informed Colonial that it had been unable to sell enough units to close on June 1, and requested an extension. Colonial refused, and subsequently declared Associates in default.

On July 21, Colonial accepted a proposal from Lincoln National Development Corporation of Indiana (Lincoln) to purchase a 50% interest in the hotel for $3.7 million. That sale took place in early September 1981.

Colonial filed suit against Associates to enforce the liquidated damages provision contained in the November 12 Agreement, claiming that the sale had failed to close solely because of Associates' inability to sell enough units in the limited partnership to finance the hotel purchase. The defendants raised several defenses: (1) the original contract, including the liquidated damages provision, had expired in early April;

(2) no enforceable agreement was reached as a result of the parties' efforts to renegotiate their transaction; (3) even if the original Agreement is enforceable, the liquidated damages provision is unenforceable as a matter of public policy because it is disproportionate to any reasonable estimate of damage that plaintiff might suffer, and therefore represents a substantial penalty; (4) the failure to close the sale was not *solely* the defendants' fault.

By cross-claim, certain of the individual defendants sought indemnity from the other defendants. That claim was bifurcated by the trial court, and has not yet been tried. A group of defendants also counterclaimed against Colonial for violation of Mass.Gen.Laws Ann. ch. 93A and for breach of fiduciary obligations. The district court granted summary judgment for Colonial on the fiduciary duty claim, and also ruled for Colonial on the Massachusetts statutory claim after trial on the merits. The defendants then filed this appeal, claiming that the district court erred both in enforcing the liquidated damages clause and in rejecting their counterclaims. We address each of those issues below, turning first to the liquidated damages clause.

## II.

### A. *Continuation of the Contract.*[2]

We need not dwell long on the question whether the November 12 Agreement remained in effect after appellants missed the April 2 due date for the Notice to Proceed. The evidence indicates that defendants believed—indeed, hoped—that the tardy notice to proceed would not undo the deal. The testimony of Stephen Sloan, one of the individuals in Associates, shows that the defendants went to the April 21 meeting advocating the position that the few days delay in the Notice to Proceed should not destroy the deal, suggesting that the defendants' intent in meeting was to negotiate an extension of the contract as it existed. Indeed, defendant Richard Zipes

---

**2.** In light of our conclusion in Part B below that the liquidated damage amount is unenforceable, we could have avoided deciding this issue and simply have assumed that the contract extended

to June 1 for purposes of our analysis in that part. The issue is clear, however, and we see no reason to refrain from deciding it.

explicitly testified that he assumed the $200,000 liquidated damages provision remained in effect even after the parties negotiated the additional $100,000 that was to be paid if the deal went forward.

Associates' argument that the Agreement was no longer in effect after April 2 is based in large part on statements made by plaintiffs that the late Notice meant the defendants were in default. Subsequent events demonstrated, however, that such assertions by plaintiffs did not signify the final termination of the Agreement but instead represented a negotiating position designed to elicit additional funds from defendants in exchange for an *extension* of the contract. In proceeding toward a closing date, the parties continued to act as if the original agreement was in effect, albeit with an additional $100,000 "late" charge.

We emphasize that the record shows the transaction was revived at *Associates'* urging, and we reject their attempt now to hide behind the literal language of the contract by arguing that the Agreement expired for good when they missed the April 2 due date for their Notice to Proceed. The district court implicitly found that the contract had been extended as a result of the April negotiations, and for the reasons we have discussed we find no clear error in that conclusion.[3]

### B. *Liquidated Damages as Penalty*

Associates argues that even if the original Agreement remained in effect through June 1, the liquidated damages provision is not enforceable because it constitutes a penalty.[4] They rely on the well established

principle that the amount of liquidated damages specified in a contract must be reasonably related to the anticipated or actual loss caused by the breach. *See, e.g., Security Safety Corp. v. Kuznicki,* 350 Mass. 157, 158, 213 N.E.2d 866, 867 (1966); *A–Z Servicenter v. Segall,* 334 Mass. 672, 675, 138 N.E.2d 266, 268 (1956); *Lynch v. Andrew,* 20 Mass.App. 623, 627, 481 N.E.2d 1383, 1386 (1985); Restatement (Second) of Contracts § 356 (1981). A provision setting an unreasonably large liquidated damages amount is unenforceable on public policy grounds as a penalty. *Lynch,* 20 Mass.App. at 627, 481 N.E.2d at 1386; *Warner v. Wilkey,* 2 Mass.App. 798, 799, 307 N.E.2d 847, 849 (1974); Restatement (Second) of Contracts § 356(1); Restatement of Contracts § 339.[5]

Defendants claim that the $200,000 damage amount is unreasonable both as an estimate, as of November 12, 1980, of the damages that plaintiffs *might* incur and when compared with the damages that *in fact* occurred. We disagree that the provision constituted a penalty at the time the Agreement was signed in late 1980. As the district court properly observed, "[o]ne could not know, at that time, when the hotel would eventually be sold, if at all, in the event that defendants defaulted." With the passage of time, Colonial would suffer a loss of interest on the $1.8 million that defendants were to have paid on June 1. At the 21% rate of interest applicable in the spring of 1981, a six-month delay would have cost Colonial $189,000. In addition, the new sale price could have been lower than that in the Agreement with defen-

---

**3.** The letter from Colonial's counsel dated April 24 indicated that the contract extension was conditioned on Associates' lawyer's preparing documents memorializing the agreement reached at the April 21 meeting. Although it does not appear that such a document was drafted, there is no indication that the parties seriously viewed the document as a prerequisite to extending the Agreement.

**4.** For purposes of our discussion, we assume that the liquidated damages clause was triggered by Associates' inability to close the deal on June 1. We offer no view of whether the evidence supports the district court's findings on that issue.

**5.** The second Restatement notes that parties to a contract may not disregard the principle of compensation when providing in advance for damages in the event of a breach. "[T]he parties to a contract are not free to provide a penalty for its breach. The central objective behind the system of contract remedies is compensatory, not punitive. Punishment of a promisor for having broken his promise has no justification on either economic or other grounds and a term providing such a penalty is unenforceable on grounds of public policy." Section 356 at Comment a.

dants, and other costs associated with the collapsed deal, such as lawyers' fees, may have been incurred.

Moreover, the decision to specify a liquidated sum appears reasonable in light of the difficulties that might have been anticipated in determining the precise amount of Colonial's damages in the event of a breach. *See Security Safety Corp.*, 350 Mass. at 158, 213 N.E.2d at 867; A. Corbin, *Corbin on Contracts* § 1060 at 350 (1964) ("In order to sustain a provision for payment of a definite sum as a liquidation of damages, it is necessary that at the time the contract is made it must appear that the injury that will be caused by breach will be difficult of estimation.") If Colonial's financial troubles had escalated even more, and the new sale price had turned out to be less than Associates agreed to pay, the parties undoubtedly would have argued over whether the "depreciation" was Colonial's or Associates' fault. In addition, the parties were likely to argue—as they have—over which expenses connected to the transaction were attributable to the breach. "When losses are difficult to quantify, considerable deference is due the parties' reasonable agreement as to liquidated damages," *Lynch*, 20 Mass.App. at 628, 481 N.E.2d at 1386. This is particularly so where, as here, "[t]here is nothing to suggest that the liquidated damages provision ... was negotiated at other than an arm's length basis between adequately represented parties." *Id.*

■ Thus, we find no error in the district court's conclusion that the liquidated damages provision was a reasonable *estimate* of difficult-to-ascertain damage at the time the parties agreed to it. That conclusion does not end our inquiry, however. As

Associates points out, Massachusetts law clearly envisions a retrospective appraisal of a liquidated damages provision in certain circumstances. If the actual damages turn out to be "easily ascertainable," a court must consider whether the stipulated sum is "unreasonably and grossly disproportionate to the real damages from a breach," *A–Z Servicenter, Inc.*, 334 Mass. at 675, 138 N.E.2d at 268; *Lynch*, 20 Mass.App. at 627, 481 N.E.2d at 1386; *Security Safety Corp.*, 350 Mass. at 158, 213 N.E.2d at 867; *Warner*, 2 Mass.App. at 799, 307 N.E.2d at 849.[6] If so, the liquidated damages provision will be deemed unenforceable as a penalty, and "the court will award the aggrieved party no more than his actual damages." *A–Z Servicenter*, 334 Mass. at 675, 138 N.E.2d at 268; *Security Safety Corp.*, 350 Mass. at 158; 213 N.E.2d at 867.[7]

We believe this is a case in which liquidated damages may not be awarded because it is easy to ascertain that Colonial in fact suffered no damage. In reaching this conclusion, we considered the following facts:

—Colonial sold a 50% interest in the hotel on or about September 1, 1981 for $3.7 million. The buyer, Lincoln, was entitled to buy a 49% interest, which is what Associates sought to purchase, for $3,626,000—$251,000 more than the price defendants agreed to pay. Thus, all else being equal, Colonial earned $251,000 more from the purchase price than it would have without Associates' breach.

—Lincoln's purchase took place, however, three months after the June 1 closing date agreed to by Colonial and Associates. Colonial therefore lost interest for that period on the $1.8 million that defendants

**6.** The first Restatement explicitly envisioned a retrospective consideration of a liquidated damages provision:

If the parties honestly but mistakenly suppose that a breach will cause harm that will be incapable or very difficult of accurate estimation, when in fact the breach causes no harm at all or none that is incapable of accurate estimation without difficulty, their advance agreement fixing the amount to be paid as damages for the breach ... is not enforceable. § 339 at Comment e. The second Restatement also anticipates a retrospective

view: "If ... the difficulty of proof of loss is slight, less latitude is allowed in [the] approximation [of anticipated or actual harm]. If, to take an extreme case, it is clear that no loss at all has occurred, a provision fixing a substantial sum as damages is unenforceable." § 356 at Comment b.

**7.** The district court did not consider whether the liquidated damages clause in this case is unenforceable as a penalty viewed retrospectively. To that extent, the court made an error of law.

were to have paid on June 1.[8] At the 21% rate of interest asserted by Colonial, that represents a loss of $94,500.

—The loss of interest revenues from June to September was offset, however, by the fact that Lincoln paid Colonial $2.7 million when it closed the deal—$900,000 more than Colonial was to receive up front from Associates. Thus, Colonial benefitted by having use of that $900,000 until at least March 1, 1982, the earliest date on which Associates would have been obligated to pay the balance of the purchase price. Again using Colonial's 21% interest rate, the "time value" of the $900,000 for six months was $94,500.[9]

These figures show that Colonial made a profit of $251,000 on the purchase price of the hotel as a result of defendants' breach. None of Colonial's attempts to transform that profit into an approximately $200,000 loss is persuasive. Its primary theory is that it is inappropriate to compare the sale to Lincoln with the proposed sale to Colonial because economic circumstances had changed dramatically from November 1980 to the spring of 1981. Hotel construction was completed, all rooms were opened, including 131 new ones, and the hotel began making a profit. Colonial argues that the hotel's economic turnaround meant that it was worth more than when Associates contracted to purchase it.

The fact that Lincoln paid more for the hotel because it was worth more does not assist Colonial's position. Indeed, it shows that Colonial benefitted from the breach with regard to the purchase price. Colonial was obligated to complete the renovation project even after a closing with Associates, and so there are no additional construction expenses on Colonial's part to be offset against the $251,000 profit. With respect to the 49% interest, Lincoln received no more than Associates would have gotten for $251,000 less. Thus, the Lincoln deal simply was a better one for Colonial.[10]

Colonial also argues that the difference between the deals is incalculable because Lincoln purchased a 50% interest, which it contends is more valuable than a 49% interest not only because of the 1% mathematical difference but also because of the control Lincoln gained. Colonial and Lincoln put a price on that 1% interest, however, by specifying in their contract that the price would be reduced by $74,000 if Colonial's mortgage company would agree only to a sale of 49%. We see no reason in this context to disregard the value placed on the 1% interest by the parties to the agreement.[11]

Other costs asserted by Colonial include the fees and expenses associated with the failed Agreement, including accounting and legal fees, stationery costs, and the cost of taking inventory. Even were we to find that all of these costs were attributable to Associates' breach,[12] the total amount as shown through evidence at trial added up

8. In its brief, Colonial calculates lost interest on the $1.8 million from March 1, the latest date by which the parties originally intended to conduct a closing. We see no reason to calculate potential interest before June 1.

9. Colonial's counsel asserted at oral argument that we may not calculate interest for the period after September 1 because there is no evidence in the record as to the precise rate of interest at the end of 1981 and in early 1982. Our conclusion on the viability of the liquidated damages provision does not depend upon an exact interest calculation for that period; moreover, we are confident that 21% is at least a fair approximation of the rate applicable at that time.

10. Colonial's treasurer, Gardner Lord, stated in a deposition that Lincoln's offer was better than defendants'.

11. We emphasize that the $251,000 "profit" figure that we have used is based on the price to Lincoln of a 49% interest. Colonial, in fact, received an additional $74,000 for the 50% interest that it sold.

12. We question whether Colonial would be entitled to collect as damages that portion of its expenses not directly attributable to Associates' failure to meet the June 1 deadline. For example, we see no reason why Associates would be obligated to pay for legal fees associated with drawing up the contract in November 1980 because Associates had no obligation to go forward with the deal until they gave Colonial a Notice to Proceed. It seems that Colonial assumed the initial financial risks of entering into the transaction, and properly could hold Associates responsible only for those costs directly stemming from the breach of the agreement.

to only slightly more than $100,000. The higher purchase price more than compensates for those losses.[13]

At oral argument, Colonial's counsel stressed that in addition to the "hard costs" of the failed transaction—which we understand to be primarily the purchase price and lost interest—there were "soft costs," such as lost opportunities and damage to the reputation of the company. Colonial presented no evidence of these "soft" costs, and we question whether there could be such damages in light of Lincoln's $3.7 million offer just weeks after Colonial and Associates failed to close their deal on June 1. In any event, the $251,000 profit provides a cushion for even "soft costs."

Colonial claims that *Lynch v. Andrews*, 20 Mass.App. 623, 481 N.E.2d 1383 (1983), supports its claim for liquidated damages because the court there upheld a liquidated damages provision based on lost opportunities that were difficult to quantify, while emphasizing the "considerable deference ... due the parties' reasonable agreement." 20 Mass.App. at 628, 481 N.E.2d at 1386. This case differs substantially from *Lynch v. Andrews*. That case involved buyers defaulting on the purchase of a house where a liquidated damages provision entitled the seller to retain a $25,400 deposit. Under the purchase and sale agreement, half of the deposit was to be paid to the broker if the buyers defaulted, leaving only $12,700 for the seller. The seller sold her property six months after the breach for $5,000 less than the original buyers had agreed to pay. In addition, the seller claimed that she had to back out of an agreement to purchase a house that was larger and in better condition than the house she bought the following fall.

Thus, *Lynch v. Andrews* is a case in which the seller made a worse deal months after the buyer's default and in which the

seller specified a lost opportunity of some value. The liquidated damages provision gave to the plaintiff only $7,700 more than her direct out-of-pocket costs. It should be clear from the facts discussed previously that this is not a case like *Lynch*.

We therefore conclude that the $200,000 liquidated damages provision is unenforceable because it is "so disproportionate to the plaintiff's losses and expenses caused by the defendants' breach" as to constitute a penalty, *Warner*, 2 Mass.App. at 799, 307 N.E.2d at 849. Indeed, this appears to be the "extreme case" in which no loss at all has occurred. *See* Restatement (Second) of Contracts, § 356, Comment b.

### III.

Defendants claim that Colonial breached its fiduciary duty to them and violated the Massachusetts deceptive business practices statute, Mass.Gen.Laws Ann. ch. 93A, in a number of ways. These include: (1) the failure to disclose its contacts with Lincoln during the spring of 1981; (2) its assignment of an interest in the November contract to EssexBank in May 1981[14]; (3) the refusal to go ahead with the deal with defendants after June 1; (4) the ultimate sale of an interest in the hotel to Lincoln.

■ The district court rejected defendants' fiduciary duty claims on the ground that no partnership or other fiduciary relationship existed between the parties at the time of Colonial's allegedly disloyal acts. The court concluded that the parties were engaged in an arms-length transaction for the sale of the hotel interest, and that no partnership involving these parties would be activated until after a closing had taken place. The court also held that Colonial did not violate chapter 93A.

We find no error in the district court's conclusions and, indeed, fully agree with them. Our understanding of the anticipa-

---

**13.** It could be argued that the liquidated damages provision here should be upheld because the precise amount of Colonial's net profit from the Lincoln sale is not "easily ascertainable," *see A–Z Servicenter, Inc.*, 334 Mass. at 675, 138 N.E.2d at 268. It *is* clear, however, that Colonial suffered no damage, and it would be senseless to require any more precise calculation as a

prerequisite for holding this liquidated damages provision to be unenforceable.

**14.** We offer no opinion on whether Colonial assigned its entire interest in the Agreement or only its right to collect the proceeds due from Associates.

ted chronology of the transactions is as follows:

—Defendants, Associates, buy 49% of the hotel from Colonial;

—Colonial Acquisition Partnership, of which Associates is a general partner and one individual is a limited partner, acquires Associates' rights to the hotel;[15]

—Colonial Acquisition Partnership assigns its 49% interest in the hotel and Colonial assigns its 51% interest to the Colonial Hotel Company, a limited partnership in which Colonial is the general partner and Colonial Acquisition Partnership is the limited partner.

The only agreement between plaintiff Colonial and defendant Associates is the November 12 Agreement, which is nothing more than an arms-length contract for the sale of real estate. The two parties to that contract—the two parties in this lawsuit—did not purport to form a partnership by virtue of that agreement. It is true, as defendants assert, that the individuals involved in the original Agreement were to be partners in the Colonial Hotel Company Limited Partnership—the entity that eventually would own the hotel. But that later partnership was contingent on the original acquisition of an interest in the hotel by Associates.[16]

■ Thus, the district court correctly concluded that no fiduciary relationship existed between Colonial and the defendants in this case. The court also properly rejected defendants' claim under Mass.Gen.Laws Ann. ch. 93A. Colonial's efforts to secure a new buyer and obtain additional financing were prompted by Associates' inability to recruit enough investors by the original contract deadline. Associates had explicit-

ly admitted its difficulties to George Page, Colonial's president, in early April, and it was at about that time that Colonial first made contact with Lincoln. The delay in closing also forced Colonial to seek the new EssexBank loan and make the assignment of rights, which was to be revoked when the closing occurred. Colonial's refusal to extend the date for closing beyond June 1 also does not constitute an unfair or deceptive practice in light of Associates' previous failures to meet the deadlines and admitted difficulties in raising sufficient funds to consummate the deal. This is not a case in which Colonial led defendants along to their detriment while putting in place a better deal for itself. *Cf. Greenstein v. Flatley*, 19 Mass.App. 351, 474 N.E.2d 1130 (1985). Associates had failed to come up with the money to buy the hotel interest even within the extended period of time given by Colonial, and it would have been imprudent at that point for Colonial to turn away a financially able buyer. Moreover, defendants do not claim that they gave Colonial any assurance that they would be able to raise the money in the foreseeable future.

## IV.

To summarize briefly, we conclude that plaintiff Colonial is not entitled to liquidated damages in the amount of $200,000 because it suffered no compensable damage as a result of Associates' breach. We also affirm the district court's judgments on defendants' counterclaims, concluding that Colonial neither owed a fiduciary duty to Associates nor violated Mass.Gen.Laws Ann. ch. 93A.

15. It appears that the first two steps of this transaction in effect would have been merged because Associates was to contribute its contractual rights to acquire the 49% interest in the hotel to Colonial Acquisition Partnership.

16. In an effort to show that a partnership between the parties in this case existed as of the November 12 Agreement, defendants cite a clause in the Colonial Hotel Company Agreement of Limited Partnership that states that the partnership between Colonial and Colonial Acquisition Partnership was formed not only for

the purpose of owning and managing the property but for the purpose of acquiring title to the property as well.

This clause does not show an intent to be partners with respect to the original sale of the 49% interest from Colonial to Colonial Associates. The context makes it clear that for this partnership the purpose of acquiring title to the hotel must have referred to the goal of obtaining the separate 49% and 51% interests that would be held by Colonial Acquisition Partnership and Colonial *after* the original sale.

AFFIRMED IN PART, REVERSED IN PART. NO COSTS.