**PERFECT SOLUTIONS, INC., Plaintiff,**

v.

**JEREOD, INC., et al., Defendants.**

**Civ.A. No. 95–11870–MAP.**

United States District Court,
D. Massachusetts.

July 29, 1997.

[redacted]

1. Plaintiffs initially rejected the offer to substitute counsel.

Geoffrey A. Wilson, Trudel, Bartlett, Barry, Wilson, MacNicol, Greenfield, MA, for Plaintiff.

Michael A. Fitzhugh, Fitzhugh & Assoc., Boston, MA, for Defendants.

PONSOR, District Judge.

Upon *de novo* review, the Report and Recommendation is hereby adopted and defendants motion (Dkt. No. 62) is DENIED. Plaintiff has made a sufficient showing to avoid summary judgment. The issue of damages may be re-visited at trial. The clerk will set this case for a conference before me.

So ordered.

*REPORT AND RECOMMENDATION WITH REGARD TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

April 18, 1997.

NEIMAN, United States Magistrate Judge.

Plaintiff Perfect Solutions, Inc. ("PS"), a Massachusetts software company, seeks recovery in contract against seventeen Florida video stores, doing business as the American Video Network ("AVN"), and their president Robert Zlatkiss ("Zlatkiss").[1] Defendants' motion for summary judgment has been referred to this Court for a report and recommendation. *See* 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, the Court

---

1. The AVN stores and Zlatkiss are hereinafter collectively referred to as "Defendants."

recommends that Defendants' motion be DENIED.

## I. *SUMMARY JUDGMENT STANDARD*

The role of summary judgment in civil litigation is to pierce the boilerplate of the pleadings and assay the parties' proof in an effort to determine whether trial is actually required. *McIntosh v. Antonino*, 71 F.3d 29, 33 (1st Cir.1995) (citing *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir.1992)). The Court must view the evidence as a whole, rather than in isolation. *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991). The facts, and all reasonable inferences that may be drawn from them, must be viewed in a light most favorable to the non-moving party, *see Guzman–Rivera v. Rivera–Cruz*, 29 F.3d 3, 4 (1st Cir.1994), who bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact, *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir.1994) (discussing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986)). Summary judgment is appropriate where the record reveals no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## II. *FACTUAL BACKGROUND*

The facts of this case, stated in a light most favorable to PS, follow. The Court has omitted certain "factual" statements, (*e.g.*, Defs.' Statement of Material Facts ("Defs.' Facts") ¶¶ 13, 19, 20 and 23), that have no apparent support in the record. *See* Fed.R.Civ.P. 56(c); L.R. 56.1.

PS is in the business of developing, licensing and servicing computer software. (Compl.¶ 25.) It commenced operations in February of 1989. (Defs.' Facts ¶ 1.) Mark Durbin ("Durbin") owned fifty percent of PS until early 1991. (*Id.* ¶ 3.) Durbin was also involved in an entity known as Oshci Enterprises ("Oshci") and had, through Oshci, developed a software program entitled "Encore!." (Defts' Ex. 3.) One of Encore!'s uses was in video store computers. (Compl.¶ 25.) At some point prior to March 1, 1993, Oshci

transferred the rights to Encore! to PS, which in its best year made about $61,000 from the software. (*See* Defs.' Ex. 3; Defs.' Ex. 1 at 85–88.) What happened prior to that time is the subject of some dispute.

Durbin claims that, prior to the Oshci–PS transaction, Oshci, through one of its employees, Ralph Adams ("Adams"), had "sold" copies of Encore! "outright" to AVN, which at that time was comprised of eight stores. (Defs.' Ex. 3; *see also* Defs.' Ex. 4 at 16–17, 91.) PS's president, James Neilson ("Neilson"), on the other hand, asserts that Durbin's statement that Encore! was "sold" to AVN is "gross[ly] inaccura[te]" and that he had "no reason to believe that [the statement was] true." (Pl.'s Ex. C at 24–25.) Adams, PS asserts, merely sold AVN "computers" on which he "installed" Encore!. (Defs.' Ex. 4 at 16–17.) In any event, there is apparently no dispute that, at some point prior to March 1, 1993, AVN gained access to Encore! and modified the software for its own internal use.

On or about March 1, 1993, PS, now the putative owner of Encore!, entered into two contracts with AVN regarding AVN's continued use of the software. The first contract, a copy of which appears at Defendants' Exhibit 8, is a "licensing" agreement. It gave PS the power to license, but not sell, Encore! to AVN. (Defs.' Ex. 8 ¶ 1.1.) In return, AVN promised to treat Encore! as proprietary, to use each licensed copy only in conjunction with a single computer for its own internal use and to pay PS "a one-time licensing fee in the amount of fifteen-hundred dollars ($1500)." (*Id.* ¶ 2(a)-(c).) In addition, AVN agreed to the following:

(d) upon the execution of this Agreement, [AVN shall] provide to PS a complete list of all of AVN's retail stores, such list to include the Software serial number. Any such location with duplicate serial numbers shall have a new serial number assigned by PS and AVN shall install such serialization software; and

(e) prior to AVN's use of the Software at additional locations, AVN shall register the full address and legal name of each such location with PS. Further, AVN shall obtain from PS serialization software specific

to each location and such serialization software shall be installed by AVN. Such serialization software shall not be unreasonably witheld [sic] by PS. Any duplicate use of serialized copies of the Software by AVN shall be an unauthorized use of the Software under this Agreement.

(Pl.'s Ex. I ¶ 2(d) and (e).) [2] The agreement also included the following provision with respect to damages, which PS claims was fully discussed before the agreement was signed:

> AVN agrees that the use of the Software in a manner unauthorized by and or inconsistent with this Agreement will cause PS irreparable damage, and that PS shall have specific rights including, but not limited to[:] equitable and injunctive relief to prevent the unauthorized use or disclosure; the greater of ten-thousand dollars ($10,000) for, or such damages as are occasioned by, each instance of such unauthorized use or disclosure; and attorney's fees.

(*Id.* ¶ 5.)

The second contract between PS and AVN, a copy of which appears at Defendants' Exhibit 10, is a confidential disclosure and non-competition agreement. It provided, *inter alia*, that PS would give AVN confidential and proprietary information that would enable AVN to enhance AVN's use of Encore! and release AVN from liability for its prior use of Encore!. (*Id.* ¶ 1.) In return, AVN agreed to treat any information provided by PS as proprietary and confidential. (*See id.* ¶¶ 2–6, 8 and 9.) Specifically, the parties agreed to the following provisions:

> 2. AVN-agrees (a) not to divulge or in any way make available such proprietary and or confidential information to any person or third party without the express written consent of PS; . . .
>
> 3. AVN· shall disclose or give access to such proprietary and or confidential information only to such employees having a need to know in connection with AVN's use herewith. AVN shall advise such employees of the proprietary and or confidential nature of the information, and AVN agrees to use reasonable care to safeguard said information and to prevent the unauthorized use or disclosure thereof.
>
> 4. No copies of any proprietary and or confidential information shall be made, except for archival purposes, without the express written consent of PS. AVN shall, upon request, appraise [sic] PS in writing of the number of copies in existence and in the possession and control of AVN. Any unauthorized copies or reproductions of software shall bear the copyright and or proprietary notices contained in the original.

(*Id.* ¶¶ 2(a), 3 and 4.) This second agreement also included a damages provision similar to that found in the licensing agreement.[3]

Both agreements, which were reviewed and approved by Defendants' counsel, provided that they would be governed under Massachusetts law. (Defs.' Exs. 8 ¶ 10 and 10 ¶ 16.) In addition, both stated that, although their duties were non-delegable and their rights non-assignable (*see* Defs.' Exs. 8 ¶ 6 and 10 ¶ 10), their provisions extended to any future corporation doing business under the AVN umbrella (*see* Defs.' Exs. 8 ¶ 11 and 10 ¶ 17). Finally, both agreements were signed by Neilson and personally guaranteed by Zlatkiss.

On April 5, 1993 Neilson sent a letter to Zlatkiss requesting that Zlatkiss forward documentation of, and changes in, Encore!'s access code pursuant to ¶ 2(d) of the licensing agreement. (Defs.' Ex. 12.) Between April 5, 1993 and January of 1994, Neilson

---

**2.** The above quote is from the copy of the licensing agreement supplied by PS (Pl.'s Ex. I) which differs slightly from the copy supplied by Defendants (Defs.' Ex. 8). PS asserts, without any apparent dispute from Defendants, that its exhibit is "the final version" of the agreement. (Pl.'s Opp'n at 3.)

**3.** The provision reads as follows: "AVN acknowledges that the use or disclosure of the proprietary and or confidential information in a manner unauthorized by and or inconsistent with this Agreement will cause PS irreparable damage, and that PS shall have specific rights, including, but not limited to[:] equitable and injunctive relief to prevent the unauthorized use or disclosure; the greater of ten-thousand dollars ($10,000) for, or such damages as are occasioned by, each instance of such unauthorized use or disclosure; and attorney's fees." (*Id.* ¶ 7.)

made several telephone calls to Zlatkiss regarding Zlatkiss' alleged failure to perform pursuant to the March 1, 1993 agreements. (Defs.' Ex. 2 at 5.)

In a letter dated January 26, 1994, Ron Sparks ("Sparks"), vice president of AVN, provided Neilson with "documentation" of the Encore! serial numbers at "all [AVN] stores." (Defs.' Ex. 13.) Attached to the letter is a typewritten list of eleven AVN stores and the serial numbers of the Encore! software used therein. The names of six other stores are handwritten on the attachment, although it appears as if five of those stores were added on May 16, 1995. (*See id.*)

In February or March of 1994, Sparks told Neilson that AVN expected to be opening two to three more stores in conjunction with an outside investor. (Defs.' Ex. 2 at 5.) Immediately thereafter, Neilson called Zlatkiss with this information and Zlatkiss stated that "Sparks doesn't know anything" and that the deal with the investor had fallen through. (*Id.* at 5–6.) However, in a letter dated June 13, 1994, Sparks indicated to Neilson that AVN had twelve stores. (Defs.' Ex. 13.)

In the summer or fall of 1994, Neilson twice asked Zlatkiss whether Zlatkiss was planning on opening any other video stores. (Defs.' Ex. 2 at 6.) Zlatkiss responded in the negative. (*Id.*) Nonetheless, by 1995 AVN had expanded from eight to seventeen stores, each one a defendant in this action. (*See* Pl.'s Opp'n at 6.) At his deposition, Neilson asserted that AVN supplied unprotected and unserialized software to the new stores. (Pl.'s Ex. C at 69, 70 and 72.) He later claimed, however, that he had no proof of any unauthorized use of Encore! and that he was unable to estimate the damage, if any, to PS. (Defs.' Ex. 1 at 130–32).

On or about March 20, 1995, Zlatkiss sold the assets of the seventeen AVN stores to Blockbuster Entertainment Group, Inc. ("Blockbuster"), a video store conglomerate. (*See* Pl.'s Ex. E.) The asset sale apparently occurred after Durbin advised Zlatkiss in a letter dated May 15, 1994, that Oshci "had no understandings, either written or verbal[,] with [AVN] regarding any future restrictions regarding resale or future use of the purchased software." (Defs.' Ex. 3.)

On March 31, 1995, PS and Blockbuster entered into a licensing agreement similar to the one previously agreed to by AVN. (Defs.' Ex. 15.) Specifically, PS covenanted to provide Blockbuster with a license to use the Encore! software currently installed at the seventeen stores purchased from AVN and to release Blockbuster from any liability for using Encore! from the date of the AVN asset sale through May 2, 1995. (*Id.* ¶ 1.) In return, Blockbuster promised to treat the software as proprietary, to pay PS a $2,495 fee for each license and to refrain from copying or distributing the software. (*Id.* ¶ 2.) PS's agreement with Blockbuster also included a damages provision similar to that quoted above (*id.* 5), as well as an understanding that the contract be construed according to Massachusetts law (*id.* ¶ 10). Finally, Blockbuster entered into a confidential disclosure and non-competition agreement with PS similar to the one PS entered into with AVN. (Defs.' Ex. 16.)

In a May 10, 1995 letter to Zlatkiss, Blockbuster's attorney, Theodore Richman ("Richman"), charged AVN with breaching the asset purchase agreement by transferring to Blockbuster an unassignable license for the use of Encore!. (Pl.'s Ex. E.) Richman indicated that, pursuant to Blockbuster's March 31, 1995 licensing agreement with PS, Blockbuster would hold back $43,415 from the monies it was paying to AVN. (*Id.; see also* Pl.'s Ex. F.) The $43,415 represented the $2,495 license fee Blockbuster paid PS for each of the seventeen AVN stores, plus a $1,000 legal and administrative fee. (Pl.'s Ex. E.)

### III. *ARGUMENTS*

In the complaint, PS asserts that its March 1, 1993 agreements with AVN were breached (1) when AVN expanded its operations to a total of seventeen stores in which Encore! was used and (2) when the software was subsequently disseminated to Blockbuster's stores. Claiming hundreds of instances of unauthorized use or disclosure, PS seeks damages in excess of $2,000,000 at $10,000

for each breach. (*See* Pl.'s Ex. F; H'g Tr. (Docket No. 45) at 14–15.)

Defendants' motion for summary judgment addresses the damages issue only. First, Defendants—relying on the Restatement (Second) of Contracts, § 356, *Colonial at Lynnfield, Inc. v. Sloan,* 870 F.2d 761, 764–65 (1st Cir.1989), and *A–Z Servicenter, Inc. v. Segall,* 334 Mass. 672, 138 N.E.2d 266, 268 (1956)—argue that the $10,000 damages provision is unconscionable, as a matter of law and policy, and therefore unenforceable. In essence, Defendants claim that the provision works as a penalty, and that, in any event, PS suffered no loss.

Second, citing *Amarin Plastics, Inc. v. Maryland Cup Corp.,* 946 F.2d 147, 151 (1st Cir.1991), Defendants contend that PS waived any right to enforce the damages provision when it failed to put Defendants on notice at the time the alleged breaches occurred. Third, Defendants assert that Blockbuster's payment to PS of approximately $43,000 satisfied any obligations of the Defendants since the money, in fact, came from Defendants' coffers.

In opposition, PS first claims that the damages provision is not unconscionable as a matter of law or policy because, given the nature of the computer business, actual damages were impossible to ascertain ahead of time. *See Space Master Intern., Inc. v. Worcester,* 940 F.2d 16, 18 (1st Cir.1991). Moreover, PS disputes the assertion that it suffered no loss; on the contrary, it claims to have lost control over the dissemination of its trade secret.

As to Defendants' second argument, PS contends that factual issues concerning waiver—*e.g.,* whether PS acquiesced in Defendants' breaches, informed Defendants of its intention to enforce the contract or was notified of Defendants' expansion to seventeen stores—preclude summary judgment. Finally, PS argues that the approximately $43,000 it received from Blockbuster had nothing to do with Defendants' own liability. That Blockbuster had a separate contract action against Defendants, PS claims, is of no moment.[4]

## IV. DISCUSSION

### A. LIQUIDATED DAMAGES

 For purposes here, both parties have assumed that the clause at issue concerns liquidated damages. The Massachusetts Supreme Judicial Court has said the following regarding liquidated damages:

> Whether a provision of a contract for the payment of a sum upon a breach is rendered unenforceable by reason of its being a penalty depends upon the circumstances of each case. Where actual damages are difficult to ascertain and where the sum agreed upon by the parties at the time of the execution of the contract represents a reasonable estimate of the actual damages, such a contract will be enforced. But where the actual damages are easily ascertainable and the stipulated sum is unreasonably and grossly disproportionate to the real damages from a breach, or is unconscionably excessive, the court will award the aggrieved party no more than his actual damages. The words "liquidated damages and not as a penalty" ... are not decisive. If from the nature of the transaction and the attending circumstances it appears that the contract is a cloak to hide a sum of money out of proportion to and differing greatly from the actual damages ordinarily arising from a breach, then the sum named as in the case at bar is a penalty. This is true even if it may be designated in the contract as liquidated damages.

*A–Z Servicenter,* 138 N.E.2d at 268–69 (citations omitted). *See also* Restatement (Second) of Contracts, § 356(1) ("Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is un-

---

4. In addition, PS argues that Defendants' continued L.R. 56.1 failures warrant denial of the motion. (Pl.'s Opp'n at 2–3). The Court empathizes with PS's concerns, particularly given the previous order of this Court (Docket No. 59), but has nonetheless considered Defendants' 56.1 statement as revised.

enforceable on the grounds of public policy as a penalty.").

] Similarly, the First Circuit, citing both *A–Z Servicenter* and the Restatement, has identified two factors in Massachusetts for determining whether an amount fixed as liquidated damages is not so unreasonably large as to be unenforceable:

> First, to be reasonable the amount must approximate actual loss or loss anticipated at the time the contract was executed. Second, "[t]he greater the difficulty either of proving that loss has occurred or of establishing its amount with the requisite certainty ... the easier it is to show that the amount fixed is reasonable."

*Space Master*, 940 F.2d at 17–18 (quoting Restatement (Second) of Contracts, § 356 comment (b) (other citations omitted). The First Circuit recognizes that in Massachusetts "[c]onsiderable," but "not unlimited" deference, "is given to the parties' reasonable agreement as to the amount of liquidated damages where losses are difficult to quantify." *Id.* (citations omitted). Nonetheless, the court concedes that "Massachusetts law clearly envisions a retrospective appraisal of a liquidated damages provision in certain circumstances." *Sloan*, 870 F.2d at 765.

Here, the parties appear to agree only that *actual* damages have not in fact been established, although that agreement arises from polar opposite positions. Defendants assert that PS has not been damaged at all. PS, on the other hand, claiming to have lost control over the dissemination of its trade secret, argues that its damages are incalculable, thereby necessitating application of the $10,000 damage award for each breach.

The analysis of the first factor set out in *Space Master* is immediately complicated by the very clause at issue. Although the parties have proceeded as if the clause is one for "liquidated damages," that term is nowhere used in the parties' two contracts. Moreover, the clause itself provides for alternative remedies, namely, "the greater of ten thousand dollars ($10,000) for, or such damages as are occasioned by, each instance of ... unauthorized use or disclosure." Thus, oddly enough for a liquidated damages clause, the provision appears to assume that actual damages can be established in each instance of a breach: if actual damages are greater than ten thousand dollars, then the higher amount would be imposed; if actual damages are less, then the $10,000 amount would apply. As a result, the assumption built into the first inquiry—that actual damages are difficult to ascertain—is seemingly contradicted by the terms of the clause itself. The Court therefore questions whether the clause is even appropriately one for "liquidated damages."

Another aspect of the instant dispute—the number of unauthorized "uses or disclosures"—further complicates the first inquiry required by *Space Master*. Was there only one continuing violation? Was there one violation every time AVN added a new store beyond the original eight? Was there one or seventeen violations when AVN transferred the software to Blockbuster? PS, claiming over two million dollars in damages, has not articulated exactly how there were over two hundred contractual breaches. In contrast, in *Sloan*, there was only one acknowledged breach, facilitating the First Circuit's appraisal of the liquidated damages clause at issue. *Id.* 870 F.2d at 764 n. 4.

Notwithstanding these difficulties, PS cites *Rare Blue Music, Inc. v. Guttadauro*, 616 F.Supp. 1528 (D.Mass.1985), for the proposition that an infringer may indeed be penalized for each instance of infringement even when, together, the individual instances constitute one pattern of infringement. There, an operator of an entertainment establishment, played five of the plaintiff's copyrighted songs without authorization in one evening. Statutory "in lieu" damages were measured and then awarded by the court with respect to each of the five instances. *Id.* at 1531. A similar result was reached in *Gamma Audio & Video, Inc. v. Ean–Chea*, 11 F.3d 1106, 1117–18 (1st Cir.1993), in which the First Circuit determined that each version of a television serial episode was infringed even though they all appeared on one video tape. *See also Polygram Intern. Pub., Inc. v. Nevada/Tig, Inc.*, 855 F.Supp. 1314 (D.Mass.1994).

Plaintiff also cites this line of cases for the proposition that $10,000 is not an unconscionable amount to impose for an individual breach of proprietary rights. The Copyright Act, on which the cases are based, authorizes a court to award a copyright holder whose copyright has been infringed either actual damages, 17 U.S.C. § 504(b), or statutory damages ranging from $500 to $20,000, 17 U.S.C. § 504(c)(1). By its own terms, therefore, the Act does not address fixed liquidated damages. Rather, it allows for an award of damages within a significant range and, further, permits a court to measure damages in light of several factors, among which are "(1) expenses saved and profits reaped by the defendant, (2) revenues lost by the plaintiffs, (3) the deterrent value of the award, and (4) whether the infringement was willful or innocent." *Polygram*, 855 F.Supp. at 1335 (citing *Rare Blue Music*, 616 F.Supp. at 1530).

Accordingly, a court, viewing an entire copyright case, can balance a damage amount for each breach with the number of breaches proven. For example, when the First Circuit in *Gamma* concluded that there were a greater number of breaches than the trial court had found, it remanded the case for a recalculation of damages, previously set at $2,500 per breach. *Id.*, 11 F.3d at 1119. By implication, the district court, upon reconsideration of the applicable factors, was free to discard the $2,500 figure and impose a lower amount for each breach.

While the Copyright Act obviously does not govern the present controversy, it nonetheless provides a framework with which to analyze the damages clause at issue here, a distinct hybrid of actual and liquidated damages. The trial court may only be able to fully analyze the reasonableness of the liquidated damages component of the clause after the number of breaches has been proven by PS. The higher the number of breaches, the more disproportionate the liquidated damages clause might become.

Addressing only that part of the clause which establishes liquidated damages, and without reference at this time to the number of breaches, the Court cannot say, as a matter of law, that Zlatkiss did not anticipate that $10,000 could flow were there to be a breach of the agreements with PS. *Compare Tamburo v. Calvin*, No. 94–5206, 1995 WL 121539, at *7 (N.D.Ill. Mar. 17, 1995) (unpublished) (noting that $1,500,000 for each violation of non-competition clause of software licensing agreement is "egregious"). In this regard, the present matter is not unlike *Sloan*, in which the decision to specify a liquidated sum appeared "reasonable in light of the difficulties that might have been anticipated in determining the precise amount of ... damages in the event of a breach." *Id.*, 870 F.2d at 765. *Compare A–Z Servicenter*, 138 N.E.2d at 267 (acceleration provision of mortgage note constituted a penalty). As PS argues, the $10,000 amount specified in the contracts could well approximate loss anticipated at the time the contracts were executed. *Id.* According to PS, prior to signing the agreements it consulted with AVN regarding damages and made it amply clear that an unauthorized use of the software would "cause PS irreparable damage." (Defs.' Ex. 8, ¶ 5.)

As the First Circuit pointed out in *Space Master*, however, deference to the parties' reasonable agreement as to the amount of liquidated damages is not unlimited. *Id.*, 940 F.2d at 18. PS still has to prove some harm. *See id.* (liquidated damages provision may not be enforced when no loss has been sustained from a breach). As the First Circuit directs, "Liquidated damages must compensate for loss rather than punish for a breach: '(A)n exaction of punishment for a breach which could produce no possible damage has long been deemed oppressive and unjust.'" *Id.* (quoting *Priebe & Sons, Inc., v. United States*, 332 U.S. 407, 413, 68 S.Ct. 123, 126–27, 92 L.Ed. 32 (1947)).

Of course, if PS is ultimately able to prove actual damages for a particular breach, even if those damages are imprecise, *see Sloan*, 870 F.2d at 767 n. 13, the trial court can still compare the damages shown to the damages allowed by the parties' contracts. That the $10,000 amount might be deemed, at this point, to have been a reasonable estimate of damages which might occur upon breach does not necessarily mean that it is reasonable in light of damages which in fact oc-

curred. A retrospective appraisal at trial could well determine that the anticipated liquidated amount acts as a penalty. The stipulated sum could be grossly disproportionate to the damages actually suffered, and the trial court might award no more than the actual damages suffered, despite contractual language to the contrary. *See id.*

 To sum up, the parties' contracts do not contain standard liquidated damages clauses. Rather, as described, the contractual damages allowed in the case of an individual breach are the greater of actual damages or $10,000. Depending on the amount of actual damages ultimately found, the trial court, with a retrospective look, may well determine that the damages provision, as written, had a built-in penalty. At this time, however, in light of the genuine issues of material facts determinative of whether the contractual damages provision provides reasonable compensation or imposes a penalty, this Court believes that summary judgment should be denied.

## B. *WAIVER*

Defendants claim that PS waived its right to enforce the damages provisions when it failed to notify Defendants at the time the alleged breaches occurred. On this issue, the Court must agree with PS. At this point, there appears to be genuine factual issues as to whether PS acquiesced in Defendants' breaches, informed Defendants of its intention to enforce the contracts or was notified of Defendants' expansion to seventeen stores. Defendants' waiver argument is not grounds for granting summary judgment.

5. The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court within ten (10) days of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of

## C. *SATISFACTION*

With respect to Defendants' third argument, the approximately $43,000 paid by Blockbuster appears to have resolved any issue PS had with Blockbuster, not, as a matter of law, with Defendants. Assuming that, by disseminating Encore! to Blockbuster, Defendants engaged in an "unauthorized use or disclosure," the Court cannot presume that Blockbuster's own unauthorized use of the software—for which it settled with PS—satisfies any of Defendants' obligations.

## V. *CONCLUSION*

For the foregoing reasons, the Court recommends that Defendants' motion for summary judgment be DENIED.[5]

Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Secretary of Health & Human Services,* 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega,* 678 F.2d 376, 378–379 (1st Cir.1982); *Park Motor Mart v. Ford Motor Co.,* 616 F.2d 603, 604 (1st Cir.1980). *See also Thomas v. Arn,* 474 U.S. 140, 154–55, 106 S.Ct. 466, 474–75, 88 L.Ed.2d 435 (1985). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.