# United States Court of Appeals
## For the First Circuit

No. 12-2403

BOSE CORPORATION,

Plaintiff, Appellee,

v.

SALMAN EJAZ,

Defendant, Appellant.


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]


Before

Lynch, Chief Judge,
Torruella and Kayatta, Circuit Judges.


Emily E. Smith-Lee, with whom Sana Abdullah and Smith Lee Nebenzahl LLP were on brief, for appellant.
Jeffrey S. Patterson, with whom Christopher S. Finnerty, Morgan T. Nickerson, and Nelson Mullins Riley & Scarborough LLP were on brief, for appellee.


October 4, 2013

**LYNCH, <u>Chief Judge</u>**.  Plaintiff Bose Corporation won summary judgment on its breach of contract and trademark claims against defendant Salman Ejaz.  <u>Bose Corp.</u> v. <u>Ejaz</u>, No. 11-10629, 2012 WL 4052861 (D. Mass. Sept. 13, 2012).  Ejaz admitted to selling home theater systems manufactured by Bose for use in the United States to customers in other countries, selling them across international markets to take advantage of higher retail prices abroad.  Bose asserted that Ejaz sold its American products in Australia without Bose's consent even though he had signed a settlement agreement promising not to do so after he had made similar sales in Europe.  Ejaz appeals, and we affirm.

I.

Because this case comes to us following Bose's motion for summary judgment, we recite the facts in the light most favorable to Ejaz.

Ejaz first began selling Bose products online through eBay as early as 2005.  He was not an authorized reseller or distributor of Bose products.  Rather, he sought to take advantage of the fact that the price of electronics can vary significantly between different countries, and would buy electronics in one country and resell them in another.  Products sold in this way are known as "gray market goods" because the goods themselves are legitimate and unaltered products of the claimed manufacturer, but they are sold outside of their intended retail markets.

-2-

Throughout 2005 and 2006, Ejaz sold Bose products designed for use in the United States to customers in other countries, mostly in Europe. Bose soon became aware of Ejaz's activities and approached him in late 2006 with threats of legal action. At that time, Bose indicated that Ejaz could be liable for roughly $250,000 for trademark infringement based on his unauthorized sales of Bose products. Bose then went on to offer a settlement: in essence, Bose would drop all of its existing legal claims against Ejaz, including a suit that it had already filed in the United Kingdom, and in exchange, Ejaz would not sell Bose products without Bose's permission.

Negotiations over the settlement were tense. Ejaz chose to be unrepresented and later stated that he found the tactics Bose's lawyers used "very pressurizing, very intimidating." He was recently married, and he and his wife were "anxious to resolve the dispute." Ejaz felt as though Bose's lawyers were implicitly suggesting throughout the negotiations that he would go to jail if he did not reach an agreement with Bose, although he never claims such threats of criminal prosecution were actually made. By January of 2007, Ejaz agreed to settle the claims.

The agreement was executed through two documents. First, the parties agreed to the terms of a written Settlement Agreement. The Settlement Agreement released all of Bose's preexisting claims, including those not related to the U.K. lawsuit, and prohibited

Ejaz from selling Bose products anywhere in the world without Bose's prior consent. It further provided that Ejaz would owe Bose $50,000 in liquidated damages for every violation of the Settlement Agreement. Ejaz signed the Settlement Agreement on January 27, 2007. Bose signed it on February 26, 2007, and it took effect on that date. Second, the Settlement Agreement included a Consent Order, to be filed in the British High Court of Justice. The Consent Order was filed with that court on February 23, 2007, and issued by that court on March 9, 2007. The Consent Order terminated the U.K. lawsuit in exchange for Ejaz's promise to stop selling Bose products in the European Union.

Not long after executing the Settlement Agreement, Ejaz violated it. As he wrote in an email, "greed got [the] better of [him]," and he started selling Bose products in Australia. In response, Bose initiated the present case. Bose sought damages against Ejaz for breach of the Settlement Agreement on seven occasions.[1] It also added further claims, of which only its claim for trademark infringement is relevant here.

After discovery, Bose moved for summary judgment. Ejaz opposed the motion, claiming that there were a number of disputed material facts relating to several contract defenses. He further

---

[1] By his own admission, Ejaz sold at least seven units in Australia. For purposes of this case, Bose has decided to rely on that admission and seek recovery for seven violations of the Settlement Agreement rather than try to prove a potentially much greater number of sales.

maintained that Bose had not carried its burden of proving each element of its trademark claim.

Ejaz also asked the district court to extend discovery before ruling on Bose's motion for summary judgment. He complained that Bose's corporate representative had been unable to answer questions on many of the topics for which he had been designated to give deposition testimony on Bose's behalf. That inability was particularly problematic, Ejaz maintained, because Bose had previously opposed a motion to extend discovery by explaining that Ejaz would be able to obtain all the information he needed by deposing its corporate representative. Ejaz argued that Bose had thus obstructed his discovery attempts, and that he should be granted more time for discovery as a result.

Without ruling on the motion to extend discovery, the district court granted summary judgment in favor of Bose on its breach of contract and trademark infringement claims. Ejaz now appeals. He argues that the Settlement Agreement, or at least its liquidated damages provision, is unenforceable, and that the district court erred in holding him liable under it on summary judgment. He further argues that genuine questions of material fact remain such that summary judgment on the trademark infringement claim is inappropriate. Finally, he contends that the district court abused its discretion in declining to extend

discovery.  We reject these claims and affirm the grant of summary judgment.

II.

We review the district court's grant of summary judgment de novo, drawing all reasonable inferences in favor of the nonmoving party.  Rockwood v. SKF USA Inc., 687 F.3d 1, 9 (1st Cir. 2012).  Summary judgment is appropriate "when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  Cortés-Rivera v. Dep't of Corr. & Rehab. of P.R., 626 F.3d 21, 26 (1st Cir. 2010).

According to Section 8.4 of the Settlement Agreement, "interpretation and performance of [] [the] Agreement" is governed by Massachusetts law.[2]  Under Massachusetts law, a breach of contract claim requires the plaintiff to show that (1) a valid contract between the parties existed, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant was in breach of the contract, and (4) the plaintiff sustained damages as a result. See Singarella v. City of Boston, 173 N.E.2d 290, 291 (Mass. 1961). Ejaz contests only two elements of Bose's case: whether a valid contract existed and whether the contract's liquidated damages clause is enforceable.

---

[2] The parties have not raised any choice of law issues and instead assume that Massachusetts law applies.  We will do the same.

A.        Contract Validity

Ejaz offers four arguments to explain why the Settlement Agreement is not a valid contract: (1) there was no consideration supporting the Settlement Agreement, (2) there was no meeting of the minds when the parties signed the Agreement, (3) the Settlement Agreement is unconscionable, and (4) he signed the Settlement Agreement under duress.

1.        Consideration

Ejaz argues that the Settlement Agreement lacked consideration because, although it purported to release Bose's legal claims against Ejaz, that release was illusory, as the earlier Consent Order in the British courts had already released those same claims.  This argument is contradicted by the facts of the case in three respects: the Consent Order was not an "earlier," separate agreement, but rather part and parcel of the Settlement Agreement; the actual issuance of the Consent Order was not earlier; and the releases were not coextensive.  Ejaz signed the Settlement Agreement on January 27, 2007 and has not identified any releases predating that agreement.  The Settlement Agreement became effective upon Bose's signing it on February 26, 2007.  The Consent Order was not issued until March 9, 2007, after both parties had executed the Settlement Agreement.  Additionally, the Consent Order released only those legal claims at issue in the U.K. litigation, while the Settlement Agreement released all legal claims,

-7-

regardless of location. Ejaz did receive consideration for his promises in the Settlement Agreement.

2. <u>Meeting of the Minds</u>

Ejaz offers two arguments for his claim that there was no meeting of the minds. First, he contends that he subjectively attached a different understanding to the contract than Bose did: Bose believed, in accordance with the contract's explicit language, that Ejaz would be barred from selling Bose products anywhere without permission, while Ejaz believed that he would be barred from selling Bose products only in the United States and United Kingdom, leaving him free to sell in Australia. Second, he argues on appeal that he never even saw the terms of the Settlement Agreement before signing it, and that instead he was merely given a signature page that he thought corresponded to the Consent Order, which he had previously reviewed.

Ejaz's subjective belief is insufficient to invalidate the contract. Absent fraud, an individual "who signs a written agreement is bound by its terms whether he reads and understands them or not." <u>Awuah</u> v. <u>Coverall N. Am., Inc.</u>, 703 F.3d 36, 44 (1st Cir. 2012) (quoting <u>St. Fleur</u> v. <u>WPI Cable Sys./Mutron</u>, 879 N.E.2d 27, 35 (Mass. 2008)) (internal quotation mark omitted). Ejaz falls directly within the scope of this rule.

Ejaz's second argument attempts to avoid that rule by asserting that he was defrauded, arguing Massachusetts binds an

individual to the terms of the contract he signs only "in the absence of fraud." Haufler v. Zotos, 845 N.E.2d 322, 333 (Mass. 2006). But that argument is completely unsupported by the record. Fraud is an affirmative defense that must be pleaded with particularity, see Fed. R. Civ. P. 9(b), and Ejaz failed to do so. Indeed, his answer to the complaint never even makes the contention that Ejaz presses in his brief, that Bose had Ejaz sign the Settlement Agreement without his knowledge; much less does it give specific details about any allegedly fraudulent transaction. Without those specific details, Ejaz's fraud claim cannot prevail. See N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 16 (1st Cir. 2009).

Additionally, regardless of the quality of Ejaz's pleadings, the evidence in the record shows that Ejaz did have the full Settlement Agreement and knew what he was signing: he stated in his deposition that he "tried [his] best to read it" and signed it on the same day he received it; that he had his wife review the document; and that he "must've read" the whole Settlement Agreement when he signed it. As a result, the contract does not fail for a lack of meeting of the minds.

3.      Unconscionability as Defense to the Contract

Ejaz claims that Bose's lawyers used heavy-handed tactics to get him, unrepresented by counsel, to sign the Settlement Agreement. Unconscionability is an affirmative defense, placing

the burden of proof on Ejaz.  See E.H. Ashley & Co., Inc. v. Wells Fargo Alarm Servs., 907 F.2d 1274, 1278 (1st Cir. 1990).  Under Massachusetts law, unconscionability requires a "two-part inquiry," in which the defendant must prove both "procedural" and "substantive" unconscionability.  Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 329 (1st Cir. 2008) (quoting Zapatha v. Dairy Mart, Inc., 408 N.E.2d 1370, 1377 n.13 (Mass. 1980)) (internal quotation marks omitted).

The evidence does not show substantive unconscionability as to the making of the contract here.  We discuss later the discrete issue of the liquidated damages clause.  Contracts are substantively unconscionable if they show a "gross disparity" in consideration that makes them facially unfair.  E.g. Waters v. Min Ltd., 587 N.E.2d 231, 234 (Mass. 1992) (finding "gross disparity" where annuity with $189,000 immediate cash value was sold for $50,000, and citing as unconscionable another case in which a trust interest worth $1,100,000 was sold for $66,000).  The record in this case shows that, at the time he signed the agreement, Ejaz understood that he would be relieved of legal liability that could have reached $250,000 in the U.K. litigation alone.[3]  Because the

_____

  [3] The record is unclear as to whether the $250,000 figure refers specifically to the U.K. litigation, which was addressed in the Consent Order.  But that distinction is immaterial, because the Settlement Agreement settled all claims, including those covered by the Consent Order, and incorporated the Consent Order within its terms.

financial benefit for him was at least a quarter of a million dollars in liability avoided, no reasonable factfinder could conclude that Ejaz has met his burden of proof in his attempt to establish unconscionability.

    4.    <u>Duress</u>

Duress is an affirmative defense for which Ejaz must prove three elements: "(1) he has been the victim of some unlawful or wrongful act or threat; (2) the act or threat deprived him of his free or unfettered will; and (3) due to the first two factors, he was compelled to make a disproportionate exchange of values." <u>Happ</u> v. <u>Corning, Inc.</u>, 466 F.3d 41, 44 (1st Cir. 2006). Ejaz contends that Bose acted wrongfully by pressuring and intimidating him using what he says he perceived as threats of jail time, and that Bose's attorneys violated the Massachusetts Rules of Professional Conduct by advising him, as an unrepresented party, to sign the Settlement Agreement. These actions, he claims, constituted duress.

Ejaz mischaracterizes the facts of this case. Bose's lawyers approached him, a savvy internet businessman with total annual eBay sales near $75,000 and growing quickly,[4] to offer a settlement agreement to avoid a lawsuit. Those lawyers, according to Ejaz, told him that there could be "repercussions" to his

_____

[4] Ejaz's sales the previous year, 2005, were no higher than $50,000; by 2010, his financial records showed sales exceeding two million British pounds annually.

-11-

actions, which Ejaz took to mean criminal sanctions. However, Ejaz does not assert that Bose actually made threats, as opposed to statements that he subjectively interpreted to be threatening. Indeed, as he described the exchange in his deposition, Bose's lawyer "might have said [something] along the lines that people do end up going to jail but I don't remember him exactly saying that, but behind the words was that implication. Or at least I felt that way." Ejaz later stated in his affidavit: "I do not remember the precise words that they used about the consequences of not signing the agreement, but what I understood from those conversations is that I could face penalties of as much as $250,000 and possible imprisonment if I did not agree to what they were asking." None of these statements show that Ejaz was ever actually threatened or that Bose's counsel delivered any threats; rather, they show only that Ejaz believed he could potentially face legal penalties due to his unlawful sales. This is far from the "unlawful or wrongful act or threat," Happ, 466 F.3d at 44, required to establish a duress defense.

More importantly, Ejaz has provided no basis to believe that the statements by Bose's counsel "deprived him of his free or unfettered will," id., and forced him to sign the contract. Instead, the facts show that Ejaz was able to review the proposed agreement at his own pace, was free to seek advice from others (and actually did seek advice from his wife), and voluntarily signed and

-12-

returned it. As long as the option to reject the contract remained, Ejaz did not act under duress. Ismert & Assocs., Inc. v. New Eng. Mut. Life Ins. Co., 801 F.2d 536, 549-50 (1st Cir. 1986) (noting that the option to refuse to sign a release and to litigate instead would defeat a claim for duress, and observing that "a strict interpretation" of the concept of "no real choice" is "what the Massachusetts courts intend" as a policy matter).

B.          Enforceability of Liquidated Damages Clause

Apart from the validity of the entire contract, Ejaz also challenges the Settlement Agreement's liquidated damages clause in particular. He argues that it is unenforceable because it is not reasonably proportional to Bose's anticipated damages and difficulties of proving loss at the time the Settlement Agreement was executed.[5] This is a closer question.

---

[5] Ejaz also makes two other arguments, but both are easily rejected. First, he claims that there is a dispute over whether the parties intended the clause to serve as liquidated damages or as a penalty -- a genuine dispute of material fact that prevents a grant of summary judgment. That argument is simply wrong. Whether a clause imposes enforceable liquidated damages or an unenforceable penalty is a question of law. NPS, LLC v. Minihane, 886 N.E.2d 670, 673 (Mass. 2008). Even if the clause's effect were a question of fact, Ejaz points to no record evidence indicating that he believed at the time of contracting that the clause was intended to be a penalty. Second, Ejaz claims that the clause is unenforceable because it is disproportionate to the damages Bose actually suffered. But this argument cannot square with Kelly v. Marx, 705 N.E.2d 1114 (Mass. 1999), which explicitly stated that the damages actually suffered have no bearing on the enforceability of a liquidated damages clause. See id. at 1117.

-13-

Massachusetts law allows enforcement of a liquidated damages clause "so long as it is not so disproportionate to anticipated damages as to constitute a penalty." TAL Fin. Corp. v. CSC Consulting, Inc., 844 N.E.2d 1085, 1093 (Mass. 2006). The inquiry depends significantly on the facts of the case, see Honey Dew Assocs., Inc. v. M&K Food Corp., 241 F.3d 23, 28 (1st Cir. 2001), but in general, a liquidated damages clause "will usually be enforced, provided two criteria are satisfied": (1) the actual damages would have been difficult to ascertain at the time of drafting, and (2) the amount was a "reasonable forecast" of damages that would actually occur in a breach. NPS, LLC v. Minihane, 886 N.E.2d 670, 673 (Mass. 2008) (quoting Cummings Props., LLC v. Nat'l Commc'ns Corp., 869 N.E.2d 617, 620 (Mass. 2007)) (internal quotation mark omitted). Ejaz bears the burden of proving that the clause is unenforceable, and reasonable doubts are drawn in favor of Bose, as the provision's proponent. See id. at 673; Honey Dew, 241 F.3d at 27.

1.    Ascertainability

Ejaz has not produced any evidence, or even argued in his brief, that Bose's actual damages would be readily ascertainable. Further, Bose showed that it would be difficult to calculate its actual damages from a breach: it introduced evidence that Ejaz's actions threatened Bose's goodwill and brand integrity, which Bose calls its "most important asset," and showed that damage to

-14-

goodwill and brand integrity is inherently difficult to quantify. The law supports Bose.  See Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc., 982 F.2d 633, 640 (1st Cir. 1992) ("By its very nature, trademark infringement results in irreparable harm because the attendant loss of profits, goodwill, and reputation cannot be satisfactorily quantified and, thus, the trademark owner cannot adequately be compensated.").  The liquidated damages provision does not fail on this ground.

### 2.    Reasonable Forecast

Ejaz has produced no record evidence suggesting that $50,000 per sale was grossly disproportionate to or an unreasonable forecast of the actual damages Bose would have expected.  Instead, he claims that the structure of the clause itself, providing $50,000 in damages for every breach, without limit, shows that the forecast is unreasonable.  But a hypothetical larger range, separated from the actual facts and the amount sought, does not make a clause unreasonable.  Rather, courts examine for reasonableness the amount of liquidated damages actually sought. See Space Master Int'l, Inc. v. City of Worcester, 940 F.2d 16, 16-17, 20 (1st Cir. 1991) (denying summary judgment motion of defendant seeking to avoid liquidated damages clause even though clause provided for per-day late fees without limit); Perfect Solutions, Inc. v. Jereod, Inc., 974 F. Supp. 77, 85 (D. Mass. 1997) (denying summary judgment motion of defendant seeking to

avoid liquidated damages clause even though clause provided for per-violation damages without limit).[6]

The Restatement also adopts this position, analyzing liquidated damages as they are actually imposed rather than in hypotheticals. See Restatement (2d) of Contracts § 356 cmt. b, illus. 3 (contemplating valid enforcement of liquidated damages clause providing for per-day late fees even though fees were unlimited, where ten days of fees are sought).

Bose articulated a series of harms showing that the liquidated damages clause is reasonable in this case.

---

[6] Courts in other jurisdictions have followed the same approach. See, e.g., ProTherapy Assocs., LLC v. AFS of Bastian, Inc., 782 F. Supp. 2d 206, 218-19 (W.D. Va. 2011) (allowing enforcement of liquidated damages provision granting uncapped damages of $10,000 per breach across fifty-seven breaches); Elexco Land Servs., Inc. v. Hennig, No. 11-CV-00214, 2011 WL 9368970, at *6 (W.D.N.Y. Dec. 28, 2011) (reserving decision of whether liquidated damages clause providing $25,000 per breach is enforceable until plaintiff actually sought damages under the clause); Mattingly Bridge Co. v. Holloway & Son Constr. Co., 694 S.W.2d 702, 704 (Ky. 1985) (allowing enforcement of liquidated damages provision granting $750 damages per day late without limit but reducing recovery from unreasonable 193-day penalty to reasonable 32 and 2/3-day damages); Bd. of Cnty. Comm'rs of Adams Cnty. v. City & Cnty. of Denver, 40 P.3d 25, 32 (Colo. App. 2001) ("If a contract stipulates a single liquidated damage amount for several possible breaches, the damage provision is invalid as a penalty if it is unreasonably disproportionate to the expected loss on the very breach that did occur and was sued upon."); Anonymous v. Anonymous, 649 N.Y.S.2d 665, 666-67 (N.Y. App. Div. 1996) (liquidated damages provision allowing $500,000 per breach of confidentiality agreement not, "in and of itself," unenforceable as against public policy); cf. Rex Trailer Co. v. United States, 350 U.S. 148, 151-152 (1956) (uncapped statutory penalty of $2000 per violation enforceable as liquidated damages rather than criminal sanction for case of five violations).

Specifically, Bose identified as its potential harms: loss of revenue from each sale (Bose's retail price for each unit was approximately $6500 (Australian)); harm to Bose's brand name; downstream effects of harm to the brand name, such as interrupting Bose's distribution chain and discouraging purchases by third parties; enforcement costs due to the possibility that Ejaz could, perhaps successfully, evade legal process, thereby increasing Bose's costs (Ejaz had explicitly told Bose's lawyers that he "will run away from the country if they come after me for any money"); and the possibility that Bose would not be able to prove all of Ejaz's sales in court (in this very case, Bose relies on proof of seven violations but asserts that there may have been many more).

The absence of affirmative proof of unreasonableness is fatal to Ejaz's argument because he bears the burden of proof. See NPS, 886 N.E.2d at 673. Since Ejaz has not introduced any evidence to rebut Bose and show that $50,000 for each of seven violations was an unreasonable forecast, he remains bound by the liquidated damages clause. See Reed v. Zipcar, Inc., No. 12-2048, 2013 WL 3744090, at *3 (1st Cir. July 17, 2013) ("Reed's complaint contains no allegations as to what a reasonable estimate of damages would be. This is sufficient to defeat [Reed's] claim . . . .").

III.

Ejaz next challenges the district court's grant of summary judgment against him on Bose's trademark infringement

-17-

claim. A plaintiff alleging trademark infringement must prove two elements: (1) the trademarks are "entitled to trademark protection," and (2) "the allegedly infringing use is likely to cause consumer confusion." Bos. Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 12 (1st Cir. 2008).[7]

There is no dispute over the first element in this case. Bose's trademarks are registered on the Principal Register of the United States Patent and Trademark Office. Registration serves as prima facie evidence that the trademarks are entitled to protection, see 15 U.S.C. § 1057(b), and Ejaz has not contested that evidence.

On the consumer confusion element, Ejaz argues that there was a genuine dispute of material fact over whether his sales of Bose products were likely to cause consumer confusion for two reasons: any differences between the products suitable for use in particular countries were trivial, and his customers on eBay would have been aware of any differences before making their purchases of products meant for use in other countries. In a gray market goods

---

[7] Bose stated claims under both federal statutory law and state common law but did not identify which state's common law would govern. Regardless, the analysis here may be collapsed into the federal claim structure because the common law trademark claims in both Massachusetts and New Jersey -- Ejaz's home state and the only other plausible candidate for the choice of law here -- both require the same elements as the federal claim. See Jenzabar, Inc. v. Long Bow Grp., Inc., 977 N.E.2d 75, 82 n.11 (Mass. App. Ct. 2012); Barre-Nat'l, Inc. v. Barr Labs., Inc., 773 F. Supp. 735, 746 (D.N.J. 1991).

-18-

case, "a material difference between goods simultaneously sold in the same market under the same name creates a presumption of consumer confusion as a matter of law." Societe Des Produits Nestle, S.A., 982 F.2d at 640. Relying on this presumption, Bose points to several material differences between its Australian products and the American products that Ejaz sold in Australia. Those differences include region coding, which will keep an American DVD player from playing Australian DVDs and vice versa; electrical power requirements, which prevent American electronics from functioning on Australian power supplies and vice versa; capabilities of the remote controls; durations of the products' warranties; and the design and functionality of the products' radio tuners.[8]    Evidence in the record, such as Bose's corporate

---

[8] Ejaz initially contended that evidence of these differences was not properly before the district court on summary judgment because statements from Bose's corporate representative not made based on personal knowledge would not have been admissible at trial. See, e.g., Noviello v. City of Boston, 398 F.3d 76, 84 (1st Cir. 2005); Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). Specifically, Ejaz argued that Bose's only evidence on this point came from its Fed. R. Civ. P. 30(b)(6) corporate representative; while an opposing party may ordinarily offer the corporate representative's testimony as a statement of a party-opponent, see Fed. R. Evid. 801(d)(2), Ejaz has argued incorrectly that Bose had presented no basis for making the testimony of its own representative admissible, because he was testifying to matters outside his personal knowledge. However, the evidence shows that Bose's representative testified on his personal knowledge about differences in technical specifications and warranties for different products. Further, there was other record evidence, such as Ejaz's own admissions, that at least one of the differences Bose identified -- the voltage requirements -- was in fact a material difference.

representative's testimony based on his personal experience and Ejaz's testimony in his deposition, as well as Ejaz's later admissions, supports that there are material differences in the products.

Ejaz attempts to minimize the evidence of material differences by asserting that his actual consumers were not in fact confused.  But that argument misses the mark.  The law requires only that the infringement is <u>likely</u> to cause consumer confusion, not that it <u>actually</u> does so.  See <u>Societe Des Produits Nestle, S.A.</u>, 982 F.2d at 640 ("[A] plaintiff need only show that a likelihood of confusion is in prospect; a showing of actual confusion is not required.  Indeed, federal courts have routinely granted injunctions in gray goods cases notwithstanding an absence of evidence of actual consumer confusion." (citations omitted)).

To that end, Ejaz claims that consumers on eBay are less susceptible to confusion than consumers in traditional stores.  His only evidence in support of this conclusion is his own affidavit, in which he asserted that based on his experience, eBay customers are "primarily bargain hunters, and understand that in exchange for significant price savings they are not purchasing from authorized re-sellers or distributors."  That statement, however, does not actually support his position because it explains only that eBay consumers would not be confused about the identity of the sellers of the products they bought; it gives no reason to believe that

they would expect the products to function differently from products sold by authorized distributors. Additionally, Ejaz's generalizations fail to counter the specific proof Bose offered, in the form of an email thread showing confusion by one of Ejaz's actual eBay customers. In light of the presumption of consumer confusion plus Bose's unrebutted evidence, no reasonable factfinder could conclude that Ejaz had met his burden of showing that the sales in question were not likely to cause consumer confusion.

IV.

Ejaz's final argument on appeal is that the district court erred by declining to extend discovery before granting Bose's motion for summary judgment.

The procedural history of the discovery in this case is not complicated. The district court set an initial discovery deadline of December 23, 2011, and later extended it to January 30, 2012. Ejaz served Bose with notice of a deposition of its corporate representative on August 12, 2011, and actually deposed the representative on January 27, 2012. At the deposition, Ejaz's counsel complained on the record that Bose's Fed. R. Civ. P. 30(b)(6) representative had not sufficiently been able to answer her questions about several topics on which he had been designated to speak. Three weeks later, on February 18, 2012, Ejaz filed a motion to reopen discovery under Rule 56(d) of the Federal Rules of Civil Procedure, claiming that Bose had obstructed his efforts to

obtain information in the case by providing an insufficiently prepared representative. The district court did not address the motion to reopen discovery and instead ruled on the summary judgment motion. Ejaz argues that the court erred in doing so.

We review a district court's refusal to reopen discovery for abuse of discretion. Vineberg v. Bissonnette, 548 F.3d 50, 55 (1st Cir. 2008). The same standard of review applies to the decision to proceed with a summary judgment motion while a discovery request remains outstanding. See Nieves-Romero v. United States, 715 F.3d 375, 380 (1st Cir. 2013).

Here, the district court was well within its discretion in ruling on the summary judgment motion first. A Rule 56(d) motion requires its proponent to show via "an affidavit or other authoritative document":

> (i) good cause for his inability to have discovered or marshalled the necessary facts earlier in the proceedings; (ii) a plausible basis for believing that additional facts probably exist and can be retrieved within a reasonable time; and (iii) an explanation of how those facts, if collected, will suffice to defeat the pending summary judgment motion.

Rivera-Torres v. Rey-Hernandez, 502 F.3d 7, 10 (1st Cir. 2007). In this case, Ejaz made no showing in support of the third requirement for a 56(d) motion -- namely, how any additional facts he collected would defeat the pending summary judgment motion. Indeed, Ejaz even suggested that no additional facts were needed, noting in his brief opposing the motion for summary judgment that "Defendant

-22-

contends that the existing record is sufficient to deny Plaintiff's motion in its entirety."  The district court did not abuse its discretion in declining to act on the 56(d) motion before considering the summary judgment motion.

V.

For the reasons stated above, the district court's decision is AFFIRMED.