# United States Court of Appeals
## For the First Circuit

No. 21-1044

JOSEPH B. SHEA,

Plaintiff, Appellant,

v.

PETER MILLETT,

Defendant, Appellee,

ALM RESEARCH LLC,

Defendant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Allison D. Burroughs, U.S. District Judge]

---

Before

Lynch, Kayatta, and Gelpí,
Circuit Judges.

---

David R. Suny, with whom Mary Theresa Moran and McCormack
Suny LLC were on brief, for appellant.
Joseph P. Davis, III, with whom Mian R. Wang, Alison T.
Holdway, and Greenberg Traurig, LLP were on brief, for appellee.

---

May 27, 2022
AMENDED OPINION[*]

---

[*] The original version of this opinion was filed on May 19,
2022,and remains on file, under seal, in the Clerk's Office.

**LYNCH**, **Circuit Judge**.    In this action under Massachusetts law by Joseph B. Shea ("Shea") for an alleged breach of an oral contract by Dr. Peter Millett ("Millett"), the district court on cross-motions entered summary judgment for Millett.  The district court correctly concluded that Shea had not satisfied the special provision of the Massachusetts statute of frauds for brokers and finders, Mass. Gen. Laws ch. 259, § 7, to establish a contractual obligation for Millett to make payments to Shea beyond June 30, 2016.  We affirm.

I.

We refer to the district court decision for a fuller discussion of the facts.  Shea v. Millett, No. 17-cv-12233, 2020 WL 6586368 (D. Mass. Nov. 10, 2020).  We discuss for our analysis the particular facts on which Shea relies.  Importantly, it is undisputed that Millett never signed any writing agreeing to pay Shea for the period Shea alleges.  Shea's claims are based on his alternative arguments that the Massachusetts statute of frauds does not apply and that, even if it does, it is satisfied by a series of writings and statements in the record.

Millett is an orthopedic surgeon.  He first met Shea -- a former sales representative of orthopedic sports medicine-related products manufactured and developed by Arthrex, Inc. -- in July 2001 at a sports medicine-focused meeting in Colorado.  Shea introduced Millett to Arthrex around that time, and Millett has

- 2 -

been a consultant and product-development surgeon for Arthrex since at least 2003.

In March 2010, Millett spoke with Shea at a medical conference in New Orleans, seeking Shea's help in negotiating a deal with Arthrex for Millett's work on certain products. Millett believed Shea had contacts at Arthrex that would be valuable to Millett's efforts in obtaining a royalty agreement with the company. The two had a ten- to fifteen-minute conversation at a bar about such an arrangement. Shea testified at his deposition that Millett offered during that conversation "15 percent of what [Millett] get[s] paid," to which Shea responded he "would rather get 10 percent for the life of the deal." Although the parties "didn't really discuss the details," Shea understands this conversation to have created a binding agreement. Millett disagrees.

The parties continued to discuss their arrangement between March and June 2010. In an email dated April 2, 2010, with the subject line "Agent agreement," Shea wrote the following to Millett:

> I'm excited about getting started on our new business relationship and I wanted to summarize our agreement with respect to the work that I will perform as your agent and business consultant. . . .
>
> *Consulting fee: $200.00 per hour . . . billed 15 minute increments, when preparing documents, meeting with potential partners and

- 3 -

discussing details, offers and plans with you. You will receive a monthly or weekly email invoice as you prefer.

. . .

*I will be paid 10 percent of any royalties, consulting fees, equity earned after the first $150,000 per year that you earn.

. . .

Millett did not respond to this email.

Shea sent Millett another email discussing the arrangement on April 7, 2010, this time adding a proposal for a "performance bonus . . . based on the significance of the deal signed with [their] new partner." There is no record of Millett responding to that email. On June 2, 2010, Shea sent Millett an invoice for 26.5 hours of consulting work at a rate of $200 per hour. Millett paid the invoice.

Five days later, Shea forwarded to Millett his April 2 email, asking him to "read it and email to confirm that [he] ha[s] read it and agree[s]." Millett responded the same day, asking Shea to "clarify [his] thoughts on the payments on royalties and payments on consulting over 150k," as he "assume[d] this [wa]s for Smith [&] Nephew only." (emphasis added). Smith & Nephew is Arthrex's competitor. Millett also asked: "[W]hat is the Term on this? Is this forever?" Millett's communication certainly does not confirm any agreement with Shea's proposed terms.

Shea responded the same day, June 7, 2010, that he thought the ten percent applied to "any royalties that [Millett

was] paid by [S]mith [&] [N]ephew or Arthrex" if Millett and Shea "were able to get [Arthrex] to pay [Millett] retroactively . . . based on [their] negotiations with [Arthrex's representative] . . . ." As for the duration of the agreement, Shea asked: "tell me your thoughts . . . I think it should last as long as you[r] contract with [S]mith [&] [N]ephew or Arthrex lasts." Shea also wrote that Millett could call him that night to discuss. There is no record of Millett ever agreeing to these terms, either by email or orally.

The parties view these exchanges differently. Shea testified at his deposition that they obligated Millett to pay Shea ten percent of any royalties Millett earned for "[a]s long as [Millet] get[s] paid by Arthrex." According to Shea, Millett was obligated to do so, regardless of whether Shea brought new business deals to Millett. To the contrary, Millett testified in his deposition: "I don't think we had mutually agreed on many things, but we agreed on certain things," e.g., the "10 percent for royalties after the first $150,000 was subtracted out if he could negotiate the royalty contract . . . ." Millett stated that he, at the time, expected Shea would "bring new opportunities," and that Millett "never agreed to an agreement in perpetuity."

The 2011 corporate minutes from Millet's company, ALM Research LLC (the "2011 minutes"),[1] reflect Millett's understanding and state: "Joe Shea -- negotiating business deals. Percentage of royalties, bring new business opportunities to ALM." The minutes further state: "The verbal agreement with Joseph Shea should be formalized. Contact Joseph Shea about his willingness to formalize an agreement." (emphasis added). Nothing was ever formalized. Shea performed no relevant work for Millett after at least 2011 and secured no new deals for him with Arthrex or any other company.

In August 2010, Millett received a draft royalty agreement from Arthrex, which he executed in September 2010 (the "2010 Royalty Agreement"). Under the 2010 Royalty Agreement, the relevant royalty payments terminated on March 31, 2016, and could be extended for a multi-year period "by mutual agreement of the parties."

Millett, through his wife as bookkeeper, began paying Shea ten percent of all royalties he received from Arthrex (for products both included in and outside of the 2010 Royalty Agreement), although "early on," Shea and Millett disagreed about their arrangement, including over the duration of the payments to

_____

[1] ALM Research was dismissed from this lawsuit in January 2019. We refer to Millett and ALM Research collectively as "Millett."

Shea. Millett testified at his deposition that he paid Shea, not because Shea "fulfill[ed] what [they] agreed upon," but because Shea "was going through a period of personal hardship" and "professional hardship," and Shea "was a friend."

In July 2013, Millett sent Shea a draft "Mutual Settlement and Release" (the "2013 Draft Release"), apparently to resolve disagreements about the terms of their 2010 oral agreement, including the duration. Shea disputes that there was any disagreement over the 2010 oral agreement and argues the parties never agreed to limit the duration of payments to Shea to the initial term of any royalty agreement secured. The 2013 Draft Release cited April 30, 2015 as the termination date of the payments to Shea. The Draft Release also states, inter alia:

> QUARTERLY PAYMENTS to Mr[.] Shea will be calculated based upon a previously agreed upon formula of 10% of the net royalty payments to ALM Research, LLC that are paid quarterly by Arthrex, Inc. for a contract which was negotiated with the assistance of Mr[.] Shea in August of 2010 between Dr[.] Millett / ALM research and Arthrex, Inc.

Based on our review of the record, neither Shea nor Millett ever signed that Draft Release. In fact, Millett made payments to Shea until June 30, 2016 (through the initial term of the 2010 Royalty Agreement),[2] for a total of more than $600,000.

---

[2] Although Shea stated in his first amended and proposed second amended complaints that Millett failed to pay him $14,999 "due in the first half of 2016," Shea makes no mention on appeal

In November 2015, Arthrex emailed Millett to inform him that the relevant royalty payments under the 2010 Royalty Agreement were set to expire. After that, Arthrex and Millett -- without the help of Shea -- agreed to extend the Agreement (the "2016 Extension"). The relevant royalties under the 2016 Extension were set to expire on a date certain several years later. In August 2016, Millett left Shea a voicemail and sent him a text message informing Shea of the expiration of the 2010 Royalty Agreement.

Shea filed this lawsuit in 2017, asserting that he is owed payments beyond the final payment made on June 30, 2016, based on the purported oral contract from 2010.[3] In 2018, Millett entered into a new royalty agreement with Arthrex that explicitly terminated the 2016 Extension (the "2018 Royalty Agreement"). The relevant royalty payments under the 2018 Royalty Agreement expire on a defined termination date a few years after the effective date. Shea played no role in Millett's receipt of that royalty contract.[4]

_____

of the assertion and does not point to anything in the record that would support it. He states instead that he is seeking "the balance of the extended term of the [2010] Royalty Agreement."

[3] Shea asserted claims for breach of contract, promissory estoppel/detrimental reliance, and violation of Mass. Gen. Laws ch. 93A, and sought damages, a declaratory judgment, and injunctive relief.

[4] In sum, Millett has entered into several royalty agreements with Arthrex over the course of their relationship. In addition to the 2010, 2016, and 2018 agreements and extensions just described, Millett and Arthrex are parties to two unrelated agreements, one executed in 2007 and the other in 2008.

On October 26, 2020, the district court entered summary judgment in favor of Millett as to all claims against him, and the court denied Shea's motion for leave to amend his complaint. Shea, 2020 WL 6586368, at *1. The court held that any agreement between the parties was unenforceable under the Massachusetts statute of frauds, Mass. Gen. Laws ch. 259, §§ 1, 7. Id. at *9-11. On Shea's motion, the district court entered a separate final judgment on Shea's claims under Fed. R. Civ. P. 54(b). Shea appeals from that judgment, arguing that the statute of frauds is inapplicable and, in any event, that the statute has been satisfied. We affirm.

## II.

Under Massachusetts law, whether an agreement is enforceable under the statute of frauds is a question of law, Simon v. Simon, 625 N.E.2d 564, 567 (Mass. App. Ct. 1994); cf. Armstrong v. Rohm & Haas Co., 349 F. Supp. 2d 71, 78 (D. Mass. 2004) ("Whether an alleged contract is legally enforceable in light of indefinite terms is a question of law for the court."), which we review de novo, Spectrum Ne., LLC v. Frey, 22 F.4th 287, 291 (1st Cir. 2022).[5]

---

[5]     This court expressed concern as to the parties' attempts to manufacture finality for statutory appellate jurisdiction purposes and questioned whether the voluntary dismissal of certain counterclaims without prejudice to finalize a judgment can "ripen" a premature notice of appeal. We need not resolve that matter. "[W]e conclude that the prudent course here is, as we sometimes do, to assume [statutory] appellate jurisdiction and proceed to the merits, given how clear they are." Donahue v. Fed. Nat'l Mortg. Ass'n, 980 F.3d 204, 207 (1st Cir. 2020).

The broker/finder provision of the Massachusetts statute of frauds provides in relevant part:

> Any agreement to pay compensation for service as a broker or finder or for service rendered in negotiating a loan or in negotiating the purchase, sale or exchange of a business, its good will, inventory, fixtures, or an interest therein, including a majority of voting interest in a corporation, shall be void and unenforceable unless such agreement is in writing, signed by the party to be charged therewith, or by some other person authorized.

Mass. Gen. Laws ch. 259, § 7.[6]  The provision's "purpose [is] to discourage claims for commission based on conversation which persons heard differently or remembered differently," as is the case here.  Alexander v. Berman, 560 N.E.2d 1295, 1298 (Mass. App. Ct. 1990).

For the reasons next described, we hold that Shea's breach of contract and related claims are barred by this statute, as Shea orally agreed to act as a broker or finder, and none of the writings he proffers meet his burden to show the necessary terms for a legally binding contract that would require Millett to pay Shea beyond what he has already received.

---

[6]    The district court also held, and Millett argues on appeal, that the alleged agreement falls under Mass. Gen. Laws ch. 259, § 1, which requires a writing for any agreement "that is not to be performed within one year."  Because we hold the agreement is covered by the broker/finder provision, we need not decide whether the one-year provision also applies.

A.   Summary Judgment

Our review of a district court's grant of summary judgment is de novo.  See Bose Corp. v. Ejaz, 732 F.3d 17, 21 (1st Cir. 2013).  Summary judgment is appropriate "when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  Id. (quoting Cortés-Rivera v. Dep't of Corr. & Rehab. of P.R., 626 F.3d 21, 26 (1st Cir. 2010)).  Where the parties file cross-motions for summary judgment, we "view each motion separately, drawing all inferences in favor of the nonmoving party."  Fadili v. Deutsche Bank Nat'l Tr. Co., 772 F.3d 951, 943 (1st Cir. 2014).

i. Shea Was a Broker or Finder

Massachusetts courts construe Mass. Gen. Laws ch. 259, § 7 liberally and give ordinary meaning to the terms "broker" and "finder."  See Cantell v. Hill Holliday Connors Cosmopulos, Inc., 772 N.E.2d 1078, 1081 (Mass. App. Ct. 2002).  A broker is an "agent who acts as an intermediary or negotiator" or who is "employed to make bargains and contracts between other persons in matters of trade, commerce, and navigation," id. at 1082 (quoting Broker, Black's Law Dictionary (7th ed. 1999)), whereas a finder is "[a]n intermediary who brings together parties for a business opportunity," id. at 1082 (alteration in original) (quoting Finder, Black's Law Dictionary (7th ed. 1999)).  See also Corp. Dev. Assocs. v. Staples, Inc., No. 122183, 2013 Mass. Super. LEXIS

- 11 -

9, at *9 (Mass. Super. Ct. Jan. 31, 2013) ("A finder differs from a broker-dealer because the finder merely brings two parties together to make their own contract, while a broker-dealer usually participates in the negotiations." (quoting Finder, Black's Law Dictionary (9th ed. 2009))). Massachusetts courts apply the provision to arrangements where, as here, one of the parties agrees to help the other facilitate a deal with a third party. Cf. Cantell, 772 N.E.2d at 1082; Corp. Dev. Assocs., 2013 Mass. Super. LEXIS 9, at *9.

The undisputed evidence is that Shea's services to Millett were that of a "broker" or "finder" as contemplated by the statute.[7] Shea testified at his deposition that he understood his "obligations w[ere] to help [Millett] secure a royalty deal that [Millett] had previously been unable to secure," and agreed that the oral "agreement had Dr. Millett paying [Shea] for [his] time negotiating deals." Shea's second June 7, 2010 email references his and Millett's "negotiations with [Arthrex's representative]." And in 2010, Shea reached out to representatives of various medical device companies to discuss Millett and help facilitate a business deal between Millett and a third party: Arthrex.[8]

---

[7] There is no merit in Shea's overbroad claim that whether a party is a broker or finder is "not amenable to resolution on summary judgment."

[8] That Millett had a prior business relationship with Arthrex does not change this result. See Alexander, 560 N.E.2d at 1297 (determining a plaintiff was a broker where he brought

- 12 -

We turn next to the question of whether or not the writings and statements on which Shea relies satisfy the statute of frauds.

## ii. The Statute of Frauds Is Not Satisfied

Shea concedes that Millett never signed any writing in which Millett agreed to make payments to Shea for as long as Shea alleges. Shea's case depends on the emails exchanged by the parties in 2010, the 2010 Royalty Agreement, the payments Millett made to Shea through June 30, 2016, Millett's admission in his deposition that the parties had an oral agreement of some kind, the 2011 minutes, and the 2013 Draft Release. Shea argues these writings and statements adequately establish the parties' mutual understanding that Millett would continue paying Shea at least through the expiration of the 2016 Extension.[9] Millett's position is that no enforceable contract was formed, as he did not sign any of these writings, and the writings fail to reflect a meeting of the minds on the terms necessary for a contract, particularly the duration.

---

together for a transaction two parties who had known each other for a decade). Besides, Shea did introduce Millett to Arthrex, albeit several years prior to the 2010 Royalty Agreement.

[9] For our purposes, it is irrelevant whether Millett and Arthrex entered into a new royalty agreement in 2016, or merely agreed to extend the 2010 Royalty Agreement.

- 13 -

To satisfy the statute of frauds, one or more writings "must contain directly, or by implication, all of the essential terms of the parties' agreement," Simon, 625 N.E.2d at 567; see also In re Rolfe, 710 F.2d 1, 3 (1st Cir. 1983) (Breyer, J.) (quoting Restatement (Second) of Contracts § 132), and be signed by the party to be charged, Cousbelis v. Alexander, 54 N.E.2d 47, 48 (Mass. 1994) (quoting Des Brisay v. Foss, 162 N.E. 4, 6 (Mass. 1928)). The writings "must be accurate[,] must contain all the provisions of the oral contract with which the plaintiff is seeking to charge the defendant," Harrington v. Fall River Hous. Auth., 538 N.E.2d 24, 29 (Mass. App. Ct. 1989) (quoting A.B.C. Auto Parts, Inc. v. Moran, 268 N.E.2d 844, 847 (Mass. 1971)), and must set forth these essential terms with "reasonable certainty," Simon, 625 N.E.2d at 567 (citing Restatement (Second) of Contracts § 131(c) (Am. L. Inst. 1979)); see also Pappas Indus. Parks, Inc. v. Psarros, 511 N.E.2d 621, 623 (Mass. App. Ct. 1987) (describing past "caution[s] against the transformation of general expressions of intent, when significant details remain to be resolved, into legally binding agreements," "[p]articularly in the context of a complex commercial transaction"). A party's performance under an alleged oral agreement will not, without more, remove the agreement from the statue of frauds. See Marcy v. Marcy, 91 Mass. (9 Allen) 8, 12 (1864); Meng v. Trs. of Bos. Univ., 693 N.E.2d 183, 186–87 & n.4 (Mass. App. Ct. 1998).

None of the writings proffered by Shea (and certainly nothing signed by Millett) evidences agreement on the necessary terms for a contract that would require Millett to pay Shea beyond June 30, 2016. The missing material terms include "the time for payment, the duration of the contract, and . . . the parties' rights and obligations." Earley & Assocs. v. IBM Corp., No. 06-P-873, 2007 Mass. App. Unpub. LEXIS 806, at *9 (Mass. App. Ct. Aug. 28, 2007); see also Conway v. Licata, 104 F. Supp. 3d 104, 114 (D. Mass. 2015) ("The contract, as recited, also is silent as to the duration of the agreement, the duration of any period for which Defendants would be entitled to a commission, the ability of the parties to terminate the agreement, and the terms, if any, that would regulate any such termination," rendering the purported contract "too indefinite to be enforced."). And based on the record, "we cannot supply these provisions without writing a contract for the parties which they themselves did not make." Held v. Zamparelli, 431 N.E.2d 961, 962 (Mass. App. Ct. 1982); see also Simon, 625 N.E.2d at 567 ("It is a court's function . . . to determine what provisions are essential to an agreement sought to be enforced and whether an omitted provision can be supplied by implication.").

First, no writing signed by Millett specifies, or unambiguously incorporates any other document that specifies, the durational term of any agreement to pay Shea, as he claims, beyond

- 15 -

the initial term of the 2010 Royalty Agreement. We said in In re Rolfe that "only one of several writings need be signed if 'the writings in the circumstances clearly indicate that they relate to the same transaction.'" 710 F.2d at 3 (Breyer, J.) (quoting Restatement (Second) of Contracts § 132). Rolfe does not assist Shea. In Rolfe, there was "no ambiguity or uncertainty," unlike here, that the writing signed by the parties asserting the statute-of-frauds defense formed part of the same transaction as two documents not signed by them, which, in total, set forth all essential terms of the agreement. Id. Further, under the circumstances of this case (especially given Shea's lack of involvement in securing the 2016 Extension) we cannot say that "no injustice" would arise from holding Millett liable based on Shea's effort to exploit the uncertainties often inherent in claims of oral agreements. See id.

The parties' email exchanges do not establish an agreement as to any of these essential terms sufficient to satisfy the statute of frauds. To the contrary, the emails containing the most detailed proposed terms are signed only by Shea, not Millett. Further, the exchanges establish that Millett did not consent to those terms in writing despite Shea's explicit request that Millett "confirm that [he] ha[d] read [them] and agree[s]."

Further, the emails show that the parties disagreed and had not reached any agreement about Millett's payments beyond the

- 16 -

expiration of the initial term of the 2010 Royalty Agreement, if at all. See Situation Mgmt. Sys., Inc. v. Malouf, Inc., 724 N.E.2d 699, 703 (Mass. 2000) (requiring for an enforceable contract, the parties to "have progressed beyond the stage of 'imperfect negotiation.'" (quoting Lafayette Place Assocs. v. Bos. Redev. Auth., 694 N.E.2d 820, 826 (Mass. 1998))). Indeed, Millett explicitly asked Shea in his June 7, 2010 email what the term of their arrangement would be and whether it would last "forever." Shea responded: "[Y]ou tell me your thoughts . . . I think it should last as long as you[r] contract with [S]mith [&] [N]ephew or Arthrex lasts." (emphasis added). Millett did not respond in writing to Shea's proposal.[10] Millett never admitted to an agreement going beyond the 2010 Royalty Agreement's initial term. The emails also are silent as to other terms, such as the time any payment was due, the process for termination, and Shea's specific duties -- including whether or not he had an ongoing obligation to secure new deals for Millett. See Conway, 104 F. Supp. 3d at 114 ("While the absence of any one of these terms may not have rendered the contract unenforceable, in aggregate these omissions render the purported contract too indefinite to be enforced by this Court." (emphasis added)).

---

[10] The parties apparently also had other communication about the alleged agreement during this time, the exact content of which is not disclosed in the record.

- 17 -

The statements in the 2011 minutes and the proffered but unaccepted 2013 Draft Release undercut Shea's claims. The minutes say nothing about the agreement's duration. Further, the minutes provide no basis for showing that Millett understood their arrangement to require no further clarity and specificity before it was "formalized," an action that still needed to occur.[11] See Rosenfield v. U.S. Tr. Co., 195 N.E. 323, 325 (Mass. 1935) ("[When] parties contemplate the execution of a final written agreement," a strong inference typically is made that they "do not intend to be bound by earlier negotiations or agreements until the final terms are settled."). The 2013 Draft Release suffers from similar shortcomings.[12] The Draft Release -- which does not appear to be signed by either party -- does not evidence a mutual understanding as to Shea's obligations under the oral agreement or the duration or the process for termination. The Draft Release, as to duration, shows that, as of 2013, Millett intended for the payments to Shea to end on April 30, 2015. Neither document shows the parties

---

[11] The minutes do mention Shea's obligations, namely, that Shea was expected to "negotiat[e] business deals" and "bring new business opportunities." Shea admits he did not so perform, at least after the 2010 Royalty Agreement was secured.

[12] Millett also argues the 2013 Draft Release is inadmissible under Fed. R. Evid. 408 as a settlement agreement, citing Massachusetts Mutual Life Insurance Co. v. DLJ Mortgage Capital, Inc., 251 F. Supp. 3d 329, 332 (D. Mass. 2017). We need not decide this issue.

intended for Millett to pay Shea beyond the payments Millett actually made.

We reject Shea's argument that certain of Millett's statements -- which Shea calls "admissions" -- made in his deposition satisfy the statute of frauds so as to require Millett to pay Shea beyond what he has already.[13]  Shea's argument raises two questions:  whether an admission at a deposition is sufficient to eliminate the need for a writing under Mass. Gen. Laws ch. 259, § 7; and, if so, whether Millett admitted to an agreement to pay Shea through the 2016 Extension.  We do not resolve the first issue because Shea does not on appeal[14] dispute that Millett made payments to him during the term of the initial 2010 Royalty Agreement,[15] and none of Millett's statements shows that he admitted he would pay Shea beyond that term.

---

[13]  Neither party points to any authority discussing whether an oral admission by the party to be charged as to the existence of an oral agreement and all its essential terms will get around the writing requirement set forth specifically in Mass. Gen. Laws ch. 259, § 7.

[14]  Shea has not briefed on appeal the issue of whether Millett failed to make payments to Shea due prior to June 30, 2016, and has waived the argument.  See Rodríguez v. Municipality of San Juan, 659 F.3d 168, 175 (1st Cir. 2011).

[15]  This "course of conduct" does nothing to establish whether the parties would have agreed in 2010 that payments to Shea should have continued after the expiration of the 2010 Royalty Agreement's initial term.

Millett's deposition testimony shows, at most, that he understood the parties to have agreed only that he would pay Shea until the expiration of the 2010 Royalty Agreement's initial term. In an attempt to establish Millett's alleged obligation to pay beyond that date, Shea first points to Millett's statement that he and Shea "did not agree to a specific [termination] date other than what was in the contract." This statement does not support Shea's construction of the parties' oral agreement. The term, "the contract," refers only to the original 2010 Royalty Agreement, under which the relevant royalty payments expired in March 2016. Millett's statement does not establish, and Shea has pointed to no other evidence showing, that the parties intended for Shea to continue receiving payments through the 2016 Extension. Nor does the statement provide this court with a "mechanism[] to narrow present uncertainties" on this issue.[16]  Cf. Lafayette Place Assocs., 694 N.E.2d at 826.

---

[16]  In arguing to the contrary, Shea relies on SAR Group Ltd. v. E.A. Dion, Inc., 947 N.E.2d 1154 (Mass. App. Ct. June 8, 2011) (unpublished table decision, issued pursuant to Massachusetts Appeals Court Rule 1:28). Under Massachusetts law, Rule 1:28 decisions "are primarily addressed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale." See Chace v. Curran, 881 N.E.2d 792, 794 n.4 (Mass. App. Ct. 2008). That is one reason why such decisions may not be cited as binding precedent. Id. Moreover, the defendant in SAR Group had stated that "any obligation that may have existed to pay commissions was only for a 'reasonable time,'" and the court held that "reasonable time" was the type of term that could be construed and applied by a court. 947 N.E.2d at *1, *4. Here, there is no analogous statement signed by

Shea also points to Millett's statement that he and Shea agreed to "10 percent for royalties after the first $150,000 was subtracted out if [Shea] could negotiate the royalty contract, which ended up being the 2010 royalty agreement." This statement likewise does not establish the parties' intent to have Millett pay Shea beyond the expiration of the 2010 Royalty Agreement's initial term. It merely confirms that Millett orally told Shea that he would pay him ten percent of the royalties Millett received from Arthrex through March 2016, which Millett indisputably did. Even if Millett admitted in these statements an agreement to pay Shea for the duration of the initial term of the 2010 Royalty Agreement, these statements do not support Shea's position that Millett was required to pay Shea beyond that period.[17]

Shea attempts to avoid this result by analogizing to the Uniform Commercial Code ("U.C.C.") statute of frauds and cases holding under the U.C.C. that an admission by the party to be charged that a contract was formed removes the agreement from the statute of frauds. Shea relies, in addition to Massachusetts law, on Gruen Industries, Inc. v. Biller, which held that a defendant's "admission need only describe conduct or circumstances from which

_____

Millett, and his deposition testimony expressly rejected any obligation to pay more than he did pay.

[17] Simply put, a party cannot escape the statute of frauds to prove an agreement to buy ten apples by pointing to the other party's admission that he agreed to buy five apples.

- 21 -

the trier of fact can infer a contract," to rebut a statute of frauds defense. 608 F.2d 274, 278 (7th Cir. 1979). Unlike here, the statute of frauds provision in Gruen concerned the U.C.C. Further, the provision expressly deemed the statute of frauds inapplicable only when a defendant "admits . . . that a contract was made for sale of a stated quantity of described securities at a defined or stated price." Id. at 277-78 (emphasis added) (quoting Wis. Stat. § 408.319(4)). Here, there is no analogous exception to the broker/finder provision of the Massachusetts statute. Compare Mass. Gen. Laws ch. 259, § 7, with id. ch. 106, § 2-201(3)(b) (allowing enforcement of an oral contract for a sale of goods that would otherwise be barred by the statute of frauds "if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted." (emphasis added)). And if there was such an exception, it would not help Shea, as one would expect that a necessary term to be admitted in connection with a commission agreement would be duration. See 37 C.J.S. Frauds, Statute of § 162 ("[A]n admission is not effective where the essential terms of the contract are not admitted and are in dispute."). Millett did not admit to the duration argued for by Shea.

Shea's reliance on Coughlin v. McGrath, 4 N.E.2d 319 (Mass. 1936), is also misplaced. That case, where the parties had formed an oral partnership, id. at 320, is inapposite. The record here does not support Shea's contention that he and Millett entered into a partnership agreement. Millett's casual references to "partner" or "business advisor" do not as a matter of law establish such an arrangement. And Shea points to no other evidence indicating the parties' arrangement operated as a partnership.

The parties may have reached some form of an agreement in 2010. We hold that the statute of frauds nonetheless bars this court from enforcing any such agreement against Millett so as to require him to pay Shea from July 1, 2016 onward.[18]

## B. Motion for Leave to Amend

We review denials of motions for leave to amend for abuse of discretion. Pérez v. Hosp. Damas, Inc., 769 F.3d 800, 802 (1st Cir. 2014). The district court did not abuse its discretion in denying Shea's second motion for leave to file an amended complaint. As Shea concedes in his opening brief, his

---

[18] Shea does not challenge the district court's entry of summary judgment as to his Chapter 93A claim as pleaded in the first amended complaint. He also accepts that if Mass. Gen. Laws ch. 259, § 7 applies, his claim for promissory estoppel must fail. We hold the provision does apply and therefore affirm the district court's judgment as to Shea's other claims. See Corp. Dev. Assocs., 2013 Mass. Super. LEXIS 9, at *15-16; Donahue v. Heritage Prop. Inv. Tr., Inc., No. 2001-5006-A, 2006 Mass. Super. LEXIS 471, at *38 (Mass. Super. Ct. Sept. 5, 2006), aff'd, 2009 Mass. App. Unpub. LEXIS 147 (Mass. App. Ct. Apr. 16, 2009).

proposed amendments "depend upon the enforceability of the Contract."  Because the district court correctly held that there was no enforceable contract between the parties requiring Millett to pay Shea after June 30, 2016, it was not an abuse of discretion for the court to deny Shea's motion to amend.

III.

Affirmed.